[No. S022224. Aug. 24, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
DARREN CORNELIUS STANLEY, Defendant and Appellant.

918

**COUNSEL**

Richard L. Rubin, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Juliet B. Haley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—A jury convicted defendant Darren Cornelius Stanley of the first degree murder of Rudy Rubalcava (Pen. Code, § 187)[1] (count I), the attempted murder of Mitchell Fakoury (§§ 664, 187) (count IV), and the robberies of Joseph Sieder, Joseph Coggiano, Mitchell Fakoury, Joshua Adelaja, John Cheatam, and James Dollison (§§ 211, 212.5, subd. (b)) (counts II, III, V, VI, VII, and IX). A robbery-murder special circumstance was found true (§ 190.2, subd. (a)(17)(i)), and defendant was found to have personally used a deadly weapon (knife) in the commission of the murder, attempted murder, and six of the robberies. (§ 12022, subd. (b).) Defendant admitted allegations that he had suffered six prior felony convictions for residential burglary for which he had served a separate prison sentence. (§ 667, subd. (a).)

After a penalty trial the jury returned a verdict of death. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and imposed the sentence of death. Defendant also received a 27-year aggregate prison sentence for the noncapital offenses of which he was convicted. This appeal is automatic. (§ 1239.) We affirm the convictions and judgment of death but order defendant's determinate sentence reduced by two years.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

Defendant committed the murder, attempted murder, and six robberies of which he was convicted during a crime spree in Oakland that began on December 24, 1988, and ended with his arrest on January 12, 1989.

*Robbery of Joseph Sieder (Count II)*

On the afternoon of December 24, 1988, Joseph Sieder was robbed by defendant in the elevator of an apartment building at 725 Market Street in Oakland. Defendant entered the elevator while a second, taller Black man stood in the doorway. Defendant told Sieder, "Give me your mother-fucking money. I have a gun. Give me your money." When Sieder refused, defendant struck him in the face with a heavy blunt object, causing him to lose consciousness. When Sieder regained consciousness he was lying on the elevator floor, bleeding profusely, with his wallet, credit cards, and $550 cash

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

missing from his torn pants pocket. He was transported to Kaiser Hospital where his facial wounds were stitched closed. Several weeks later, Sieder attended a live lineup and identified defendant as his assailant with "90 percent" certainty. At trial, Sieder also tentatively identified a photograph of defendant's cousin, Clifford Williams, as the second, taller Black man who stood in the elevator doorway during the attack. Sieder's wallet and credit cards were later recovered during the execution of a search warrant, in connection with the Rubalcava murder, at defendant's cousin Cynthia Williams's Oakland apartment where defendant had stayed.

*Robbery of Joseph Coggiano (Count III)*

On the evening of December 27, 1988, Joseph Coggiano, a businessman, was robbed by defendant in the restroom of a service station on Castro Street in Oakland where he had stopped for gas. Two Black men entered the restroom. Coggiano testified defendant resembled the shorter of the two men, and he identified a photograph of defendant's cousin, Clifford Williams, as resembling the taller man. Defendant punched Coggiano in the face, causing him to fall to the floor, and demanded his money. Coggiano removed everything from his pockets; approximately $35–$70 was taken by defendant as Williams stood at the door. The gas station attendant came to Coggiano's assistance, pulling one of the men off of him. When Coggiano found himself alone in the restroom he locked himself in until the police arrived. Coggiano positively identified defendant as his assailant at a photographic lineup and again at a live lineup. Clifford Williams testified at trial that he and "Roger Hayes," an alias defendant was using at that time, robbed Coggiano on the evening in question.

*Robbery and attempted murder of Mitchell Fakoury (Counts IV, V)*

On the afternoon of January 7, 1989, defendant robbed and repeatedly stabbed elderly Mitchell Fakoury, who survived the attack. Fakoury was sitting in the front passenger seat of his vehicle reading a newspaper while parked in front of his clothing store on 7th Street in Oakland. A man whom he identified in court as defendant approached and asked him for the time. Within seconds defendant started waving a knife around Fakoury's neck, stating, "I'm going to kill you." Fakoury replied, "No need for that. What do you want to kill me for?" Defendant slashed Fakoury's neck, pushed him down flat on his back on the front seat and started tearing at his pants in an effort to get at his wallet in his rear pants pocket. At some point during the attack defendant stabbed Fakoury in the neck and stomach. After defendant fled with the wallet Fakoury got out of his vehicle and, seeing his clothes soaked in blood, realized the extent of his injuries. Fakoury identified People's exhibit No. 2—the knife later recovered in connection with the

Rubalcava stabbing murder—as "look[ing] pretty well like the knife" defendant used to stab him. Although he did not know "types of knives" very well, Fakoury knew defendant's knife was a "big folding knife with a little sort of knob on it."

Two young girls saw Fakoury's assailant drop a wallet on the ground as he ran from the scene. One summoned her mother, who looked inside the wallet and recognized Fakoury's picture as that of a local merchant. They ran around the corner, found Fakoury lying bleeding on the pavement, attempted to stop the flow of blood from his neck with towels, and summoned police. Fakoury was rushed to Highland Hospital. Dr. Badger, the surgeon who attended to him, testified his neck wounds were three inches to four inches deep, penetrating the muscles below his jaw, cutting through many branches of the carotid artery, and severing his jugular vein in half. Fakoury also suffered stab wounds to his stomach and right flank as well as permanent facial injuries which were evident at trial.

### Murder of Rudy Rubalcava (Count I)

On January 8, 1989, at approximately 3:45 a.m., defendant robbed and fatally stabbed Rudy Rubalcava while he was pumping gas at the Shell station on 7th and Market Streets in Oakland. The murder occurred approximately 12 hours after the robbery and attempted murder of Fakoury, and only several blocks' distance from the scene of those earlier crimes. Four witnesses observed Rubalcava's murder. Defendant's brother, Isaac Stanley, and Golden Garner and Norma Moss, both of whom knew defendant from the neighborhood, all witnessed the incident and positively identified defendant as Rubalcava's assailant. Gas station attendant Tosha Dunson, the principal witness for the defense, testified defendant was not the man she had seen rob Rubalcava.

Isaac Stanley was sitting on a bus stop bench drinking beer across the street from the Shell station and observed his brother walk over to the station and become engaged in "a tussle" with Rubalcava.[2] Isaac observed defendant punching and swinging his arm at Rubalcava while he was down on the ground, striking the victim "at least three or four times" in the head and chest. Isaac heard Rubalcava yelling, "Help this guy is trying to rob me." Afterwards, defendant ran into the apartment building at 1050 7th Street where Isaac had been staying, in apartment No. 307, and where defendant had spent several nights. Isaac followed defendant into the building and the two spent about 20 minutes in the apartment. Defendant's hand was bleeding

---

[2] Initially, the police suspected Isaac may have been involved in the assault on Rubalcava. After interviewing him, they concluded he was not.

and wrapped in a bandanna; he told Isaac he had cut himself. Defendant was angry at Isaac for not helping him. Defendant changed his clothes before leaving the apartment. On cross-examination, Isaac admitted giving a somewhat different account of the incident to police when he was taken in for questioning about the murder, and several months thereafter, when he spoke with a defense investigator. Isaac claimed he had been drinking and was under the influence on both occasions.

Golden Garner worked as a maintenance man for the buildings at 1050 7th Street, where Isaac Stanley had an apartment, and 725 Market Street, where he (Garner) shared an eighth floor apartment with Norma Moss overlooking the Shell station.[3] Garner knew defendant and Isaac Stanley from the neighborhood. He had seen both brothers in the lobby of his building on Market Street at various times, and had experienced "a little difficulty" with them and their cousin, Clifford Williams, in the past. Garner knew defendant as "D," and testified defendant has a distinct, deep "froggie" voice. He described Isaac Stanley as having a "turned eye."

At 3:45 a.m., Moss awoke Garner after seeing two men struggling at the Shell station through their window. Garner went to the window and witnessed defendant struggling with another man, whom he thought may have been of Chinese descent. The man was yelling, "Help, I'm being robbed," and defendant appeared to be dragging him on the ground as he (defendant) tried to get away. Garner also saw Isaac Stanley sitting on a bench at the bus stop across the street. After defendant fled on foot, several persons appeared at the gas station and tried to assist Rubalcava. Garner testified that Moss telephoned the police anonymously to report the attack and summon an ambulance. Certain he knew the identity of Rubalcava's assailant, Garner also telephoned the police later that day. Moss and Garner gave the police the addresses of the 725 Market Street and 1050 7th Street buildings as places where Rubalcava's assailant might be found. A few days later, Garner spoke with the Oakland police and identified a photograph of defendant as Rubalcava's assailant.

Moss testified she witnessed the attack on Rubalcava at the Shell station from her eighth floor apartment window. She initially heard loud talking and saw two men, whom she could not identify, arguing and shoving one another. One of the men started yelling for help. She saw the larger man fall to the ground; when he tried to get up she could see his pants pulled down around his thighs. Then the smaller man, whom Moss by then could make out as defendant, fled toward her apartment building. Moss called the police to report the crime. Moss also saw a man with a "wandering eye" standing at

---

[3] Defendant had assaulted and robbed Joseph Sieder in the elevator of the building at 725 Market Street two weeks earlier. (*Ante*, at p. 919.)

the bus stop across the street from the station throughout the altercation. He did not intervene when the victim cried out for help and did not leave until after the attack. Moss identified a photograph of Isaac Stanley as looking like this man. Several days later, upon defendant's arrest, Moss gave a statement to Oakland police and identified defendant's photograph as Rubalcava's assailant. Moss also identified a photograph of defendant's cousin, Clifford Williams, as someone she had seen together with defendant and Isaac Stanley on occasions in the past.

Officer John Mendez was dispatched to the Shell station at approximately 3:45 a.m. on January 9, 1989. An ambulance was already at the scene and paramedics were attending to Rubalcava. Officer Mendez observed a bloodied folding Buck knife with its tip broken off under Rubalcava's vehicle. Officer Thomas Viglienzone photographed and searched the crime scene for evidence and took the bloodied Buck knife (People's exhibit No. 2) into evidence.

Rubalcava was transported to the emergency room of Highland Hospital, arriving shortly after Dr. Badger completed surgery on Fakoury. Dr. Badger testified that, like Fakoury, Rubalcava suffered a deep stab wound to the right side of his neck, penetrating the muscles underneath his jaw bone and severing many branches of the carotid artery. Rubalcava also suffered a stab wound to the lower chest-abdominal area, which penetrated his diaphragm and liver, and three stab wounds to the right side of his head; two just above his right ear. Dr. Badger concluded that, given the timing and similarity of the nature and locations of the wounds to Fakoury and Rubalcava, the same person had attacked and stabbed both victims. Rubalcava lost over seven quarts of blood, underwent two surgeries, and died shortly thereafter from cardiorespiratory arrest due to his multiple stab wounds. Both Dr. Badger and Dr. Rogers, the pathologist who performed the autopsy on Rubalcava, believed the knife received into evidence (People's exhibit No. 2) could have caused Rubalcava's fatal wounds. During the autopsy, a small piece of metal was recovered from the inner surface of Rubalcava's skull (People's exhibit No. 6) matching the broken tip of the blade of the knife received into evidence.

Fred Stewart lived with Paula Ward and several others in apartment No. 903 at 1050 7th Street, the building in which Isaac Stanley had an apartment. When defendant and Isaac Stanley returned to the building after the incident, Stewart and Ward helped clean and bandage defendant's hand which was bleeding "real bad." Stewart heard defendant tell Isaac he was upset with him for not helping him while he was "fighting this crazy Mexican." Stewart also heard defendant tell Isaac, "I got the money, I went in the pocket, that [sic] I got the money." Two weeks earlier, Stewart had seen defendant in possession of a folding Buck knife similar to the one received into evidence, except at that time "its tip was not broken."

Three search warrants were executed in connection with the investigation of the Rubalcava murder. Credit cards and identification belonging to robbery victim Joseph Sieder were recovered from Cynthia Williams's apartment (No. 505) at 1050 7th Street in Oakland. Bloodstained clothing and tennis shoes were among the items of evidence recovered from Isaac Stanley's apartment (No. 307) in the same building. The testimony of a forensic serologist established that the blood on the tennis shoes was consistent with Rubalcava's blood and inconsistent with the blood of defendant and Fakoury.

### Robbery of Joshua Adelaja (Count VI)

On January 8, 1989, at 3:35 p.m., less than 13 hours after robbing and fatally stabbing Rubalcava, defendant robbed taxicab driver Joshua Adelaja at knifepoint. Adelaja was called to 1050 7th Street, apartment No. 903, in Oakland. He rang the bell and was told by a woman that she would be right down. As Adelaja waited in his cab in front of the building, defendant got into the rear seat, told Adelaja to wait for his "lady friend," then grabbed Adelaja by the neck, held a knife to his throat, and stated, "Don't shout, don't make any noise, don't call the police, just give me all the money." Adelaja hesitated. When defendant told him he was going to slash his throat, Adelaja gave defendant the money from his shirt pocket. Defendant told Adelaja it was not enough money and began "shaking" down the victim's pants. Adelaja complied and gave defendant approximately $100–$120 from his pants pocket. Defendant grabbed the money and ran. Adelaja positively identified defendant as his assailant in a photographic lineup, and again at a physical lineup, and also positively identified a knife later recovered from Isaac Stanley's apartment (People's exhibit No. 13) as the knife defendant held to his throat during the robbery.

### Robbery of John Cheatham (Count VII)

On January 8, 1989, at 10:15 p.m., less than seven hours after robbing Adelaja, defendant robbed a second taxicab driver, John Cheatham, at knifepoint. Cheatham was sitting in his cab at 12th and Campbell Streets in Oakland when defendant approached and asked him for a cigarette, then a light, and then pointed a knife at his throat, stating, "Give me the money, mother fucker." Cheatham complied and defendant fled with the money. Cheatham identified defendant as his assailant at a live lineup.

### Robbery of James Dollison (Count IX)

On January 12, 1989, at 4:30 p.m., defendant robbed a third taxicab driver, James Dollison, at knifepoint. Dollison was dispatched to an address on 86th Avenue where he found defendant waiting at the curb. Defendant got into the

cab, appeared to momentarily lie down in the backseat, then came up holding a butcher knife which he put to Dollison's throat or chin area. Defendant demanded money, Dollison resisted, and the two struggled for control of the knife. Defendant managed to remove $20 in currency from Dollison's rear pants pocket before Dollison gained control of the knife and "bailed out of the cab," cutting defendant's hand or fingers in the process. Defendant jumped into the driver's seat and drove off in the cab. Several days later, Dollison identified defendant as his assailant at a live lineup.

Later that same evening, Oakland police located defendant sitting in Dollison's cab parked on 80th Avenue in Oakland. When one officer approached on foot, defendant drove the cab toward him, prompting the officer to jump back into his unmarked patrol car to avoid being hit. A chase ensued involving at least five police officers, which ended when defendant crashed the cab into a private residence, fled on foot, and finally fell to the ground after warning shots were fired. Defendant's left hand was observed to be wounded and wrapped in a blood-soaked rag when he was apprehended and taken into custody.[4]

### 2. *Defense evidence*

The primary defense witness at the guilt phase was Tosha Dunson, who was working at the Shell station when Rubalcava was robbed and fatally stabbed. Dunson was asleep in the cashier's booth when a Mexican man knocked on the window, awakening her, and paid for gas. After he paid her, Dunson put her head down and closed her eyes. She was reawakened by yelling, looked up, and saw "a Mexican man and a Black man fighting." Dunson saw the Black man punch Rubalcava in the face, rip a wallet out of his rear pants pocket, and run across the street toward an apartment building. She saw no weapons in either man's hands. She called 911, telling the police it was a robbery. At one point Rubalcava came up to the booth stating he had been robbed and asking her to summon help. Dunson could see that Rubalcava was bleeding heavily, had "a hole in the back of his neck," and appeared to be in shock, with his pants torn halfway down one leg. Dunson testified at defendant's preliminary hearing, after which she told the district attorney's investigator that defendant was not the Black man she had seen fighting with Rubalcava that night. She believed the man she saw was darker than defendant. On rebuttal, the prosecution presented evidence that the windows of the cashier's booth in which Dunson worked were tinted medium brown, making things outside look several shades darker.

---

[4] Defendant was also charged with the January 10, 1989 robbery of Ornella Fuller, who was robbed at knifepoint of jewelry valued at $6,000 as she sat in her car in front of her home on 14th Street in Oakland. The jury was unable to reach a verdict on that charge (count VIII), which was dismissed on motion of the district attorney.

B. *Penalty Phase*

1. *Prosecution evidence*

The prosecution introduced evidence of defendant's juvenile criminal history, which included an escape attempt, as well as evidence of assaults upon correctional officers while he was incarcerated in Soledad Prison, and assaults upon sheriff's deputies while he was housed in county jail awaiting trial for these crimes.

In 1983, defendant was arrested for a series of residential burglaries in Berkeley. As he was being transported to juvenile hall, defendant managed to jump out of a Berkeley police vehicle while still in leg restraints, after twice unsuccessfully attempting to wrestle control of the steering wheel from Officer Emberton, who was driving, in an effort to run the vehicle off the freeway. Defendant rolled across the slow lane of the freeway and jumped 35 feet to the street below. When recaptured two hours later, defendant told Officer Emberton, "[Y]ou'll never take me alive, because I'll kill you first." Thereafter, while being treated at the hospital for injuries suffered during the escape, defendant told Officer Emberton that "it didn't matter where he was placed because there was no jail or institution that could hold him and that he would be out in a week's time." Defendant added that he would kill any police officers who tried to take him into custody or prevent his escape.

In January 1985, defendant pled guilty to nine counts of residential burglary committed in September and October of 1984. Although a juvenile at the time, defendant was prosecuted as an adult after being found unfit for treatment in juvenile court. He received a six-year state prison sentence. While incarcerated at Soledad State Prison, defendant got into fights with other prisoners on two occasions. On one such occasion, a warning shot had to be fired to break up the fight.

While in custody at the North County Jail in Oakland awaiting trial for the instant crimes, defendant struck a sheriff's deputy in the mouth after refusing to return to his cell; fought with two deputies who were attempting to retrieve a dinner tray from his cell, sending one to the hospital and resulting in a six-month disability leave; fought with and punched two deputies in the head after refusing to be moved from his cell to a multipurpose room; and attacked and violently kicked a deputy who had removed a list entitled "Police Pig of the Year" from his cell window. On one occasion while in custody at the Santa Rita Jail, defendant had to be restrained with Mace after punching and fighting with deputies after refusing to return to his cell.

## 2. *Defense evidence*

Several of defendant's family members testified in his behalf at the penalty phase. Defendant's father, Otis Stanley, Sr., testified he was divorced from defendant's mother, Dorothy Hayes, when defendant, the youngest of three brothers, was still a baby. The mother abused alcohol and neglected the children. At the age of four or five, defendant and his brothers came to live with their father and his new partner, Pearl Stanley, and her children from a prior marriage. The children of the blended family were difficult to supervise, and some got into trouble. Defendant's mother was diagnosed with cancer and died when defendant was 16. Defendant's maternal grandfather also died while defendant was in prison.

Defendant's uncle, Joseph Hayes, a water company maintenance worker and Reverend of the New Bethel Baptist Church in Oakland, testified defendant was required to attend church with all of his family members until his grandfather's death in 1981, at which time the family drifted apart. Defendant was more attached to his mother than were his brothers. While she was alive, defendant "did a little breaking and entering and stealing here and there" to help support her. Reverend Hayes told his sister (defendant's mother) not to accept money from defendant in order to discourage him from committing more crimes.

Pearl Stanley testified defendant and his brothers lived with her and their father from the time defendant was four until he moved out at age 16. Defendant went to church regularly and once saved her life when her grandchild started a fire in their house.

Defendant's older brother, Isaac Stanley, testified that while their mother was alive, defendant would steal things and sell them to buy food for her. Defendant began using crack cocaine in December 1988, using it daily and consuming eight or nine "rocks" at a time. Defendant became violent when under the influence of crack cocaine, and he was under the influence of the drug on the night of the Rubalcava robbery murder.

Cynthia Williams, defendant's cousin, testified defendant was a kind person who looked after his older brother Isaac. Trenda Stanley, whom defendant met in November 1988 and again in September 1990 while she was in jail for selling rock cocaine, testified she and defendant were married while he was awaiting trial for these crimes. In her opinion, defendant was not using drugs in late 1988, nor did she believe he committed the crimes with which he was charged. On cross-examination, she denied ever having supplied drugs to defendant.

The defense also presented the testimony of three expert witnesses regarding the effects of crack cocaine on behavior. Everett Gremminger, who

worked for the state medical board and had worked in the Oakland Police Department narcotics detail for 20 years, testified that crack or rock cocaine is a highly potent drug which, when burned and inhaled, stimulates the brain and greatly increases the heart rate and blood pressure. Crack cocaine usage causes euphoria and impairs judgment but does not render the user dysfunctional. Most of the people Gremminger arrested who were under the influence of the drug were aware of their crimes, recollected committing them, and generally committed those crimes for the purpose of obtaining more crack cocaine.

Dr. William Pierce, a qualified expert in forensic clinical psychology, was enlisted by the defense in 1990 to evaluate defendant and develop his psychological and personality profile. He met with defendant for about 12 hours and administered a battery of psychological tests. He also spoke with defendant's family members and familiarized himself with many of the records and investigative reports in the case. Dr. Pierce believed that defendant's mother's neglect of him, and her "inconsistent parenting" during his developmentally formative years, created "dependency needs" in defendant. At age 13, he exhibited more "oppositional" behavior when he quit junior high school and started committing burglaries. Dr. Pierce believed defendant's personality was characterized by an "over-idealized self-image which covers his true feelings of fear and inadequacy." This personality profile, when combined with cocaine use, would expectedly lead to increased aggressive behavior. Defendant told Dr. Pierce that in the latter part of 1988 his crack addiction controlled him and he "just started sticking people up." According to Dr. Pierce, defendant was unable to appreciate the criminality of his conduct or conform his behavior to the law due to his cocaine addiction. On cross-examination, Dr. Pierce confirmed that defendant had no medical history of head injuries or loss of consciousness, nor did defendant exhibit any organic neurological dysfunction or severe emotional or psychological disturbances.

Dr. Samuel Benson, a qualified expert in the fields of pharmacology and psychiatry, testified crack cocaine is highly addictive, as established by laboratory experiments conducted on monkeys that were given unlimited access to the drug and consumed it in fatal quantities. Based on his interviews with defendant, Dr. Benson believed defendant was severely addicted to crack cocaine at the times he committed these crimes, and that defendant's crime spree might be explained by his drug addiction.

## II. DISCUSSION

### A. *Pretrial/Jury Selection Issues*

#### 1. *Faretta motion for self-representation*

Defendant first contends the judgment must be reversed because he was denied his Sixth Amendment right to represent himself. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) We cannot agree. Defendant's request for self-representation was properly denied because, as the record reflects, he did not fully appreciate that he would be forgoing his right to the assistance of appointed counsel if permitted to represent himself. As such, the lower court reasonably concluded his purported waiver of his right to self-representation was not fully knowing and intelligent. (*Faretta, supra,* 422 U.S. at p. 835.) Moreover, in light of defendant's subsequent acceptance of several appointed counsel to represent him, both at the preliminary hearing and throughout the ensuing trial, without renewing his request for self-representation, we further conclude he must be found to have ultimately waived or abandoned his asserted right of self-representation. (*People v. Dunkle* (2005) 36 Cal.4th 861, 909 [32 Cal.Rptr.3d 23, 116 P.3d 494] (*Dunkle*).)

Defendant's conditional request for self-representation was made in the course of a renewed motion for substitution of counsel (see *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*)) in what was then municipal court, one year prior to his preliminary hearing, and nearly two years prior to the start of trial. In response to the court's initial inquiries,[5] defendant confirmed that he was making a motion for self-representation and that he wanted to proceed without a lawyer. When the court explained that self-representation in a death penalty case was "almost always unwise," defendant responded, "Hey, I feel I can defendant [*sic*] myself better than this man [Attorney Lincoln Mintz] can defend me." When the court explained to defendant that he would be up against an experienced prosecutor, and asked if he understood he would "have to play by all the rules" whether he knew the rules or not, defendant responded, "I know and I understand all the rules." But the record reflects defendant did not know and understand all the rules. In particular, he did not fully appreciate that if his request for self-representation was granted, the court would be under no further obligation to appoint standby counsel to assist him.

---

[5] The pretrial *Marsden* and *Faretta* motions were made before the Honorable Carol A. Corrigan, then judge of the Municipal Court for the Oakland-Piedmont-Emeryville Judicial District. Defendant's early request for substitution of counsel stemmed from his complaint that either the district attorney or his appointed counsel was "withholding evidence" from him during discovery.

Defendant stated to the court, "Well, I know what I'm saying at this time, I am feeling that I would like to represent myself, and I would ask the Court, you know what I'm saying, to allow me the fact that when I do—if and when I do get in trouble, to aid me and standby aide [sic]." The court explained to defendant, "It doesn't work that way . . . It's like doing surgery on yourself. If you cut the wrong place, nobody's going to stop the bleeding for you. Does that make sense to you?" Defendant replied, "Yeah. You're telling me I can represent myself, but at the same time I can't have standby aide [sic]?" The court responded, "That's right," and explained further, "I'm not going to appoint extra counsel for you. If you want to be represented by a lawyer, you may be." Defendant responded, "6th Amendment entitles I am entitled to standby aide [sic]." The court once again attempted to explain to defendant that such was not the law, and that if he wanted to represent himself, he would not be entitled as a matter of right to the assistance of appointed counsel. Defendant responded, "I would like to represent myself on this matter, and at due time, I will leave it open. If need be, I will seek necessary counsel." In response to this comment, the court yet again attempted to impress upon defendant that he had no right to the appointment of "standby aide" or "necessary counsel" if he chose to represent himself: "No, Mr. Stanley. That's not one of your choices. You either make the decision to represent yourself and you go down that road, or you get adequate and well-trained counsel. But you don't get to decide to represent yourself and decide you're in real trouble and ask for a lawyer."

The court then attempted to determine the extent of defendant's knowledge and awareness of the workings of a criminal courtroom. When asked, "What kind of experience do you have in court, Mr. Stanley?," defendant replied, "I've been back and through them numerous times. I know how they operate. I know how the courts operate. I still have yet to learn some of the tactical years and how the process works. But doing my time in and out of here, I have seen numerous of times I've got somewhat of an experience, I feel, that I can defend myself." Upon further questioning, defendant admitted he had never sat through a trial by jury or seen a jury selected, although he insisted, "But I know how it works," indicating, "I've been doing a little studying, some law books." When asked what law books he had consulted, defendant replied, "Trial jury process, you know, in which the defendant goes in there and picks who he want, *and with the assistance of counsel,* he will make the right chose [sic] with the jury whoever they don't want." (Italics added.) The court replied, "You keep talking about the assistance of counsel. You're talking about putting yourself in a spot where you don't have assistance of counsel."

When the court yet again sought to impress upon defendant that he had no right to the benefit of appointed counsel or any special assistance from the court if he chose to represent himself, defendant still commented, "Yeah, I

understand that. But at the same time, like I say, *when in due time, if I need aid by counsel, I feel I need aid by counsel, I would ask the Court—to reconcile an appointment in counsel* or I'd have to buy a counsel, either one." (Italics added.)

The court denied defendant's motion for self-representation with the following findings: "Mr. Stanley's motion to represent himself under [*Faretta*] is denied for the following reasons: [¶] First and foremost the Court finds that Mr. Stanley is not making a knowing and intelligent waiver of his right to counsel. It seems to the Court, after extended discussion, that Mr. Stanley does not completely understand either the circumstances into which he is putting himself, nor does he understand what would be expected of him if he were to attempt to represent himself in that by his own admission he has never seen a jury trial, never seen a jury picked. The Court feels based on Mr. Stanley's demeanor and his manner in which he's answering the questions that his reported understanding of the law is somewhat less inclusive than that which he represents [it] to be. I further find that he does not understand completely the reality that if he finds himself in trouble, once he's undertaken his own representation, that it is a very real possibility that the Court will not appoint counsel for him. We've discussed that several times, and he keeps coming back to the notion that if he finds himself in difficulty, he will petition the Court for appointment of counsel. In the Court's judgment, the authority of [*Faretta*] I do not feel that Mr. Stanley is making a knowing and intelligent waiver of his rights to counsel, and the Court's decision in this regard goes well beyond the court's own feeling that Mr. Stanley, in electing to represent himself, will be making a mistake. The Court's ruling is based on motion that [*sic*] based on Mr. Stanley's understanding of the situation in which he finds himself, that his waiver is not knowing and intelligent."

At the conclusion of the hearing, defendant's renewed *Marsden* motion for substitution of appointed counsel was also denied. Five months later, a third request for substitution of counsel was granted, and a new attorney (Walter Cannady) was appointed to represent defendant at the preliminary hearing and throughout trial. Defendant accepted the appointment of Attorney Cannady, as well as second trial counsel (Attorney Richard Hove), and never again renewed his request for self-representation under *Faretta.*

 "A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. (*Faretta*[*, supra,*] 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] . . . ; *People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*).) A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his

request knowingly and intelligently, having been apprised of the dangers of self-representation. (*Faretta, supra,* at p. 835; *People v. Gallego* (1990) 52 Cal.3d 115, 161 [276 Cal.Rptr. 679, 802 P.2d 169]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1224–1225 [259 Cal.Rptr. 669, 774 P.2d 698].) Second, he must make his request unequivocally. (*Faretta, supra,* at p. 835; *People v. Clark* (1992) 3 Cal.4th 41, 98 [10 Cal.Rptr.2d 554, 833 P.2d 561] (*Clark*).) Third, he must make his request within a reasonable time before trial. (*Marshall, supra,* at pp. 20–21; *Clark, supra,* at p. 98; *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].)" (*People v. Welch* (1999) 20 Cal.4th 701, 729 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

"When confronted with a request" for self-representation, "a trial court must make the defendant 'aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." ' (*Faretta, supra,* 422 U.S. at p. 835.) Unlike the right to representation by counsel, ' "[T]he right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se*." ' (. . . *Marshall*[, *supra,* at p.] 21 . . . ; *id.* at p. 23 ['[T]he court should draw every reasonable inference against waiver of the right to counsel']; see *Brewer v. Williams* (1977) 430 U.S. 387, 391, 404 [51 L.Ed.2d 424, 97 S.Ct. 1232] ['courts indulge in every reasonable presumption against waiver' of the postarraignment right to counsel].) In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo. (See *Marshall,* at pp. 24–25.)" (*People v. Dent* (2003) 30 Cal.4th 213, 217–218 [132 Cal.Rptr.2d 527, 65 P.3d 1286].)

Here, it is undisputed that defendant's request for self-representation was timely, having been made one year before his preliminary hearing and nearly two years before the start of trial. Nor has respondent argued that defendant was mentally incompetent to waive counsel. But we agree with the conclusion of respondent and the lower court that heard the motion—defendant's request to represent himself was not knowingly and intelligently made in that he did not fully understand or appreciate that the court would be under no further obligation to appoint counsel for him if his *Faretta* motion for self-representation was granted. (*Faretta, supra,* 422 U.S. at p. 835.)

■ We have observed that "a [*Faretta*] motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation." (*Marshall, supra,* 15 Cal.4th at p. 21.) "Equivocation, which sometimes refers only to speech, is broader in the context of the Sixth Amendment, and takes into account conduct as well as other expressions of intent." (*Williams v. Bartlett* (2d Cir. 1994) 44 F.3d 95, 100.) Here, defendant orally interposed his request for

self-representation during a renewed *Marsden* motion made in municipal court one year before his preliminary hearing and nearly two years before the start of trial, out of apparent annoyance or frustration with his first appointed counsel, Attorney Mintz, who he claimed was "withholding evidence" from him during the early stages of discovery. Before granting a *Faretta* motion, a trial court must determine the defendant is competent to waive his right to counsel, and must obtain his or her knowing and voluntary waiver of that right. (*Godinez v. Moran* (1993) 509 U.S. 389, 396–401 [125 L.Ed.2d 321, 113 S.Ct. 2680]; *Faretta, supra,* 422 U.S. at p. 835; *Marshall, supra,* at p. 20.) Courts must "indulge every reasonable inference against waiver of the right to counsel." (*Marshall, supra,* at p. 20.) We conclude defendant's various comments on the record reflect his belief that he had a continuing constitutional right to the appointment and assistance of counsel even if his request for self-representation were to be granted. On this record, the lower court reasonably concluded defendant was not making a knowing and intelligent waiver of his right to counsel given his failure to fully comprehend that such a waiver would lead to a full relinquishment of that constitutional right.

▪ Moreover, once defendant's request for self-representation was denied, he never renewed it. He made a third motion for substitution of counsel in municipal court, prior to commencement of his preliminary hearing, which was granted. Defendant accepted the substitution of appointed counsel (Cannady), who went on to represent him at the preliminary hearing and throughout trial in superior court. Defendant also subsequently accepted the appointment of second counsel, Richard Hove, who assisted Attorney Cannady in representing defendant at trial. In light of defendant's subsequent acceptance of several appointed counsel to represent him without ever renewing his request for self-representation, we conclude he must further be found to have ultimately abandoned his desire to invoke his *Faretta* rights in these capital murder proceedings. (Cf. *Dunkle, supra,* 36 Cal.4th at p. 909, and cases cited [*Faretta* rights waived or abandoned by subsequent conduct after erroneous denial of *Faretta* motion].)

### 2. Severance motion

Defendant next argues the trial court erred in denying his pretrial motion to sever the capital murder charge from the remaining charges.

▪ " 'The law prefers consolidation of charges. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Where, as here, the offenses charged are of the same class, joinder is proper under section 954. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145,

939 P.2d 259] (*Bradford*).)' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 574 [36 Cal.Rptr.3d 340, 123 P.3d 614] (*Manriquez*).) Defendant was charged with the robbery of each victim named in the information. He threatened and resorted to violence in each instance, and used a knife in the commission of all but two of the robberies, striking those two victims (Sieder and Coggiano) with a blunt object or his fist. In one instance defendant's knife attack nearly took the life of the victim (Fakoury); in another it proved fatal (Rubalcava). Clearly, the charged murder, attempted murder, and robberies were all offenses of the same class and were properly joined under section 954 in the first instance.

Accordingly, defendant can only predicate error in the denial of severance on a clear showing of potential prejudice. (*Manriquez, supra,* 37 Cal.4th at p. 574; *Kraft, supra,* 23 Cal.4th at p. 1030; *Bradford, supra,* 15 Cal.4th at p. 1315.) We review the trial court's denial of defendant's severance motion for an abuse of discretion. (*Manriquez,* at p. 574, and cases cited.)

Denial of severance may constitute an abuse of discretion where evidence of the crimes to be jointly tried would not be cross-admissible in separate trials. (*Bradford, supra,* 15 Cal.4th at p. 1315; *People v. Sandoval* (1992) 4 Cal.4th 155, 172–173 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Here, the evidence plainly would have been cross-admissible in separate trials to prove a fact in issue, other than mere disposition to commit crimes, such as motive, identity, opportunity, intent, plan or knowledge. (Evid. Code, § 1101, subd. (b); *People v. Gordon* (1990) 50 Cal.3d 1223, 1240 [270 Cal.Rptr. 451, 792 P.2d 251].) There were more than sufficient common marks between the Rubalcava robbery murder and the Fakoury robbery attempted murder to suggest the same individual committed both crimes (identity) for a similar purpose (motive, intent, plan). The attacks came within 13 hours of each other and were committed within five blocks of one another. The same folding Buck knife received into evidence was alleged to have been used in each attack. Both victims' wounds were virtually identical, their throats having been slashed almost to the same depth and at the same angle, each having also been stabbed in the lower chest or abdomen. The victims' wounds were so distinctive, and the injuries inflicted so close in time, that the surgeon who attended to them in the emergency room of Highland Hospital concluded both men must have been attacked by the same assailant. Both victims were attacked in or near their vehicles, and each victim's rear pants pocket was ripped from his pants in the attacker's zeal to get at his money. Furthermore, evidence of the remaining robberies, all committed within the same three-week time period, some only hours apart from one another, and in the same general area of downtown Oakland where the Fakoury and Rubalcava attacks occurred, would have been admissible in separate trials as probative of motive, modus operandi, and intent. (*Gordon,* at p. 1240.) Given

our finding of cross-admissibility, our inquiry could end here. (See *Bradford, supra,* 15 Cal.4th at p. 1317.)

Nor was this a case in which certain of the joined charges were unusually likely to inflame the jury against defendant; or one in which "weaker" charges were joined with "strong charges," causing a spillover effect that might have unfairly altered the outcome of the trial. (See *Marshall, supra,* 15 Cal.4th at pp. 27–28; *Frank v. Superior Court* (1989) 48 Cal.3d 632, 640 [257 Cal.Rptr. 550, 770 P.2d 1119].) Contrary to defendant's argument, the evidence that pointed to him as Rubalcava's murderer was already strong, notwithstanding the testimony of defense witness Tosha Dunson, who believed he was not the man she saw rob Rubalcava. Those percipient witnesses who personally knew defendant, including Golden Garner and Norma Moss, who knew him from the neighborhood and their building in which he was staying, and defendant's own brother, Isaac Stanley, all identified him as Rubalcava's assailant. Other witnesses (Stewart and Ward) heard defendant admit complicity in Rubalcava's robbery and murder in his conversation with his brother Isaac immediately after the attack. Nor were any of the noncapital offenses particularly inflammatory in comparison with the capital murder charge. (*Frank v. Superior Court, supra,* 48 Cal.3d at p. 640.) Although the facts of the Fakoury robbery and attempted murder were brutal and violent, they were no more so than the facts of the capital murder charge itself. Finally, there is no merit to defendant's further claim that the court had a sua sponte duty to give the jury a limiting instruction "as to what it could or could not do regarding cross-admissibility between the evidence relating to the capital and noncapital counts." No such instruction was required. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 942 [42 Cal.Rptr.2d 636, 897 P.2d 574] (*Hawkins*).)

We conclude denial of the severance motion was not an abuse of discretion.

### 3. Batson-Wheeler *error*

Twice during jury selection defendant claimed the prosecution was exercising its peremptory challenges to improperly excuse prospective Black jurors on the basis of race, in violation of the federal and state Constitutions. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) Hearings were conducted and the motions denied. The claims were thereafter asserted as grounds for a new trial, which motion was denied as well. They are here renewed on appeal.

Most recently, we summarized the law governing *Batson-Wheeler* motions in these terms:

■ "Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) Recently, 'the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, 'if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ' (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted (*Johnson*).) The high court clarified that 'a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson, supra*, at p. 170 [125 S.Ct. at p. 2417], reversing in part *People v. Johnson* (2003) 30 Cal.4th 1302, 1318 [1 Cal.Rptr.3d 1, 71 P.3d 270] [requiring the defendant to 'show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias'].)

■ "In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, 'the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" ' (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) '[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' (*Ibid.*) Inquiry by the trial court is not even required. (*Id.* at p. 920.) 'All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' (*Id.* at p. 924.) A reason that makes no sense is nonetheless 'sincere and legitimate' as long as it does not deny equal protection. (*Ibid.*)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1100–1101 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

The first *Batson-Wheeler* motion was made after the prosecutor peremptorily excused four Black female and one Black male prospective jurors. The court quickly declared that a prima facie case had been made out, observing that the five prospective Black jurors peremptorily excused by the prosecutor were the only Blacks to have "hit the [jury] box," and candidly stating, "[T]hat raises a suspicion in my mind, Mr. Landswick [the prosecutor], that you might be excluding blacks as a class in this case." The court asked the prosecutor for his reasons for excusing the Black prospective jurors.

It quickly became apparent, however, that the court, the prosecutor, and defense counsel were all in agreement on the matter of the prosecutor's peremptory challenge of Black male Prospective Juror Gary L., whom all agreed had been peremptorily excused for exhibiting "hostility" toward the prosecution. The court indicated it was satisfied the challenge to Mr. L. was "a bonafide peremptory challenge," and defense counsel signaled his agreement with the court's conclusion. On appeal, defendant is not contesting the peremptory challenge of Gary L. as violative of *Batson-Wheeler*.

The prosecutor then indicated that for all four of the remaining Black female prospective jurors: Carol F., Hersey D., Diane B., and Helen N., he had written down in his voir dire notes[6] "sympathy for the defendant" as the reason for his peremptory excusal of each of them. He also indicated, with regard to Prospective Juror Helen N., that "she didn't want to be here because she had a convention in Palm Springs."

When asked by the court how he had come to his conclusion, the prosecutor stated, "From their voir dire and when they were here before." He further indicated, "There are several blacks that are on the panel that are not within that classification," representing to the court that they would be

---

[6] The voir dire in this capital murder trial was conducted pursuant to the individualized and sequestered jury selection procedures outlined in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. Consequently, jury selection lasted nearly three months. As of May 14, 1991, the date on which the peremptory challenges were exercised and the *Batson-Wheeler* motions heard and denied, each of the prospective jurors to whom the motion was directed had been individually voir dired at different times during the preceding three-month period. Prospective Juror Carol F. was in the first group of prospective jurors; her voir dire was conducted on February 27, 1991, approximately 10 weeks prior to the date on which she was peremptorily excused by the prosecutor. The voir dire of Prospective Juror Hersey D. was conducted on April 8, 1991, approximately six weeks earlier. The voir dire of Prospective Juror Diane B. was conducted on April 15, 1991, four weeks earlier. The voir dire of Prospective Juror Helen N. was conducted on April 23, 1991, three weeks prior to the date she was peremptorily excused and the *Batson-Wheeler* claims heard and denied.

"acceptable" to him.[7] He added that all four prospective jurors "had expressed the fact that the defendant was Black and that they would have sympathy for that person and they are going to identify with the defendant."

At that point the court volunteered its observations with regard to Prospective Juror Helen N., observations relating back to the prosecutor's earlier comment that "she didn't want to be here because she had a convention in Palm Springs." The court informed the prosecutor and defense counsel, "Well, first of all, Ms. [N.], there's no problem with a peremptory challenge. I remember her saying that she had this convention and she—there was some reference to a convention, and she was very unhappy having to come back." The court then acknowledged the prosecutor's stated reason for excusing all four Black women, commenting, "If there is going to be an express sympathy for the defendant in this case in the guilt phase, it may be that they can't be objective." Defense counsel also acknowledged that the four Black female jurors peremptorily excused by the prosecutor had exhibited or expressed sympathy for defendant, although he went on to state his belief that, "most people are sympathetic and they feel sorry for Mr. Stanley being in here," adding, "I don't think that's a valid excuse."

The court asked the prosecutor if he would like to respond to counsel's suggestion that demonstrable sympathy for defendant may not be a "valid excuse." The prosecutor responded as follows, "Yes. And the other people that I've excused, Catherine [R.] and Pamela [O.], Ms. [R.] was a sociologist. If you recall, she would require a lot of—She is a white woman. She would require demographics on the part of the prosecution." The court responded, "But we are not concerned about that," to which the prosecutor replied, "Well, now I'm commenting on [defense counsel]. What I'm saying is that I've excused four black women and four white women and one black man, and all of them expressed similar attitudes towards the defendant, sympathy to the defendant."

The court proceeded to deny the first *Batson-Wheeler* motion with the following comments, "All right. Well, the Court comes to the conclusion then in the guilt phase if there is—*if there is some sympathy toward the defendant, maybe these jurors cannot be—cannot be completely impartial because then their sympathy may, in fact, affect their deliberations.*" (Italics added.) The court went on, "But I want to caution you, Mr. Landswick, that if this

---

[7] This court has observed that, "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521] (*Turner*).) Here, at the conclusion of jury selection, defendant's jury included one Black male juror. Two of the three alternate jurors were also Black, although they were ultimately never seated on the jury.

continues you may have a real problem with this. I mean, I'm aware of the facts. Based upon your representation, some of the white jurors that you've excused also expressed the same feelings toward the defendant. They felt sympathetic and may not be objective in their judgment." The court added, "I'll deny the *Wheeler* motion for the time being, and then we'll just see what happens."

We agree with respondent that the initial *Batson-Wheeler* motion was properly denied. The peremptory excusal of Gary L. is not contested. It is also clear that both the court and the prosecutor believed a separate race-neutral reason appeared for the peremptory excusal of Ms. Helen N., as she seemed to be expressing anxiety or concern over a conflict between her potential service on defendant's jury and a convention in Palm Springs. Although defense counsel made no comment one way or the other about Ms. N.'s stated concerns over the conflict, those concerns were apparently shared by both the court and the prosecutor. The initial *Batson-Wheeler* motion therefore boiled down to a challenge to the prosecutor's peremptory excusal of three Black female prospective jurors: Carol F., Hersey D., and Diane B.

Ultimately, "[t]he trial court was obligated to evaluate 'all the circumstances of the case' in the step three evaluation" of whether the prosecutor's race-neutral reason for peremptorily excusing the Black female prospective jurors was "sincere and credible," or whether defendant instead sustained his burden of proving unlawful discriminatory intent in the exercise of the peremptory challenges. (*People v. Reynoso, supra,* 31 Cal.4th at p. 925; *Wheeler, supra,* 22 Cal.3d at p. 280.) The court's comments summarized above reflect that the court did scrutinize the sincerity and credibility of the prosecutor's stated reason for exercising the peremptory challenges against the Black female prospective jurors. Those comments further reflect that the court *accepted* as sincere the prosecutor's proffered reason ("sympathy for the defendant") for peremptorily excusing each of the prospective jurors in question.

"Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [the prospective jurors], including the demeanor-based reason, were sincere and genuine, is entitled to 'great deference' on appeal. (*Batson, supra,* 476 U.S. at p. 98, fn. 21; [*People v.*] *Johnson* [(1989)] 47 Cal.3d [1194,] 1221 [255 Cal.Rptr. 569, 767 P.2d 1047].)" (*People v. Reynoso, supra,* 31 Cal.4th at p. 926.)

It bears emphasizing that a match in the skin color between a defendant and a prospective juror does *not* preclude a peremptory excusal on

grounds that the juror exhibited sympathy or bias either for or against the defendant who is of the same race. What *Batson* and *Wheeler* prohibit is excusal of a juror on the basis of "group bias," i.e., the *assumption* that a member of a particular group will, because of such membership, harbor particular attitudes or biases. "A party does not offend *Batson* or *Wheeler* when it excuses prospective jurors who have shown orally or in writing, or through their conduct in court, that they personally harbor biased views." (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970 [47 Cal.Rptr.3d 467].)

The record of the hearing on the new trial motion lends considerable support to the trial court's conclusion that the prosecutor was sincere when offering "sympathy for the defendant" as the race-neutral reason for his peremptory excusal of the prospective jurors in question. The *Hovey* voir dire resulted in a three-month-long jury selection process. As of the date the peremptory challenges were exercised and the *Batson-Wheeler* claims raised, 10 weeks had passed since the voir dire of Carol F., six weeks since the voir dire of Hersey D., and four weeks since the voir dire of Diane B. At the hearings conducted on the day the *Batson-Wheeler* claims were first raised, the prosecutor had only his notes from the prior three months of jury selection to refer back to. In contrast, at the new trial motion he had the additional benefit of review of the record of the individual voir dire of each prospective juror to whom the *Batson-Wheeler* motions were directed. The relevant voir dire transcripts reflect that the prosecutor was using the notation "sympathy for the defendant" in his notes quite broadly, intending it as a shorthand for varying indications of bias in favor of defendant, either expressed or exhibited by the prospective jurors during their voir dire.

For example, with regard to Prospective Juror Carol F., the prosecutor indicated at the hearing on the new trial motion that during her voir dire she had asked the court whether she was "expected to look for sympathy" or take into account any sympathetic feelings. He added, "When she asked that question, she was looking to the defendant." He also pointed out that she had stated during her voir dire, "I have some reservations about the possible inequal application of the death penalty to minority people." In response to questions regarding whether she could vote for the death penalty, the prosecutor noted she had stated, "I believe that there is always a mitigating factor." In response to questions about her feelings regarding weighing life without the possibility of parole against the death penalty, the prosecutor noted that at one point she had stated, "I honestly can't weigh one as being more relevant than the other." The prosecutor felt "that was a sympathetic evaluation to this defendant." He also noted she had stated with regard to the death penalty, "I feel that there is and perhaps there seems to me to be a disproportionate number of blacks that are assigned that penalty."

Each of these representations made by the prosecutor at the hearing on the new trial motion is borne out by the record of Prospective Juror Carol F.'s voir dire. Yet in his notes, on which he had to place principal reliance in responding to the *Batson-Wheeler* motion at the end of a three-month-long jury selection process involving the questioning of numerous potential jurors, the prosecutor had simply jotted down "sympathy for the defendant" as a notation of his concerns arising from Carol F.'s voir dire conducted 10 weeks earlier.

With regard to Prospective Juror Hersey D., the prosecutor indicated at the hearing on the new trial motion that during her voir dire she was asked by the court, "Do you think that you personally could ever vote to execute another human being?" She answered, "I think I can." The prosecutor was permitted to ask follow-up questions. He asked Ms. D., "What does 'I think I could [sic]' mean to you. May I ask this: Does it mean 'yes,' does it mean 'maybe,' or does it mean 'I don't know'?" Ms. D. replied, "I think it means 'maybe.' " The prosecutor also mentioned a second concern with Ms. D. at the hearing on the new trial motion: At another point in her voir dire, she had stated, "I think of murder and killing in two different senses. Killing is something you don't plan to do." The prosecutor explained his concern with her response in this way, "Now, let us assume, as I did when I was reviewing these people, that there is no evidence of preplanning and premeditation. Do I get to the death penalty with Hersey D.? Do I get to the penalty phase? I don't believe I do."

From these remarks we can infer the prosecutor was concerned that Ms. D. might have had difficulty finding defendant guilty of first degree felony murder if the robbery and fatal stabbing of Rudy Rubalcava was not shown to have been planned or premeditated. Here again, although the transcript of Hersey D.'s voir dire lends support to the prosecutor's concerns and representations made at the hearing on the new trial motion, in his notes of her voir dire, written six weeks before the *Batson-Wheeler* claims were raised, he simply jotted down "sympathy for the defendant" as a notation of those concerns.

With regard to Prospective Juror Diane B., the prosecutor indicated at the hearing on the new trial motion that during her voir dire he had become concerned when she began relating her experiences as an AC (Alameda-Contra Costa) Transit bus driver. At one point she had stated, "And I've seen people that has been so far down and have made—maybe the lifestyle that they were living put them on that path, and then I've also seen people have went in that direction have turned their lives around." The prosecutor explained at the hearing, "To me, I can see the sensitivity of Diane B. to the defendant." He therefore had asked her during her voir dire,

"[I]s there anything that makes you think, [']I don't think I can sign a death warrant against him, even though the evidence showed me.['] " Ms. B. replied, "When I first had seen the defendant, the first thing I thought about, you just never know. He doesn't look like he could have done anything like that, you know." The prosecutor then asked her a second followup question, "Is there anything that looking at him that makes you kind of sympathize with him?" Ms. B. replied "Yes," and indicated further, "He's young. He's a young man, and he has a whole life ahead of him. I'm young. I know what's ahead of me in life. And to think that he's been in there [county jail] for a year, that's a year lost. Or two years now. It's sad. It's really sad."

Once again, the prosecutor's voir dire notes regarding Prospective Juror Diane B., on which he relied four weeks later in responding to the *Batson-Wheeler* inquiries, simply indicated "sympathy for the defendant."

The prosecutor made a further comment at the hearing on the new trial motion that sheds additional light on the broad context in which he was using the notation "sympathy for the defendant." In describing his concerns with Black Prospective Juror Gary L., who all agree was not excused for racially suspect reasons, he explained, "One of the problems that I had *with the issue of sympathy* was obvious with Gary L. If you recall, I had made a challenge for cause of [Gary L.] because of what I called an antagonistic attitude. In my mind, [he] had an antagonistic attitude toward the entire criminal justice system." (Italics added.) This comment suggests the prosecutor sometimes used the notation "sympathy for the defendant" as a shorthand for "bias" in favor of defendant or against the criminal justice system.

The "second" *Batson-Wheeler* motion is arguably more accurately characterized as a renewal of the first motion. Within a very short time after the denial of the first motion, the prosecutor peremptorily challenged Black female Prospective Juror Tanjala S., at which point defense counsel advised the court, "We would like to renew our motion, Your Honor," and the court, counsel and defendant returned to chambers for a further hearing. The court indicated for the record that since the first motion had been denied a short time earlier, two Black prospective jurors had been seated in the jury box. One, John C., was twice passed over by the prosecutor and ultimately wound up serving on defendant's jury. Although the court never expressly indicated it was once again finding a prima facie case of *Batson-Wheeler* error as a result of the prosecutor's peremptory excusal of a single additional Black female prospective juror, the parties correctly observe that such a finding is implied given that the court immediately asked the prosecutor to state his race-neutral reasons for excusing Tanjala S.

When asked by the court, "What was the reason for the excuse [*sic*]?," the prosecutor stated, "Yes. Once again the sympathy for the defendant attitude."[8] The court, in an effort to probe the credibility of the prosecutor's race-neutral reason for peremptorily excusing Tanjala S. without delay, requested the court reporter to produce the "daily" transcript of her voir dire, which the court then reviewed to determine whether her answers reflected any notable sympathy for defendant. After reviewing the transcript, the court indicated, "I can tell you, Mr. Landswick, I didn't detect anything in her answers that would lead me to believe that she was sympathetic." The prosecutor reviewed the transcript as well, and indicated he too could find nothing therein reflecting that Tanjala S. had specifically expressed sympathy for defendant.

However, in the course of his exchange with the court, the prosecutor pointed to a number of intangible signs that, he asserted, reflected Ms. S.'s inclination to sympathize with defendant. The prosecutor indicated, "Just the way they appear to me in the courtroom." He then told the court, "Her body language. The way they sit and look at the defendant. I make these notes as you conduct the voir dire . . . ." The court responded, "Well, that's what I want to know." When the court urged the prosecutor to be more specific, asking him, "What? What? On the record, the way she sat, the way she looked at the defendant?," the prosecutor replied, "Yes, it's her appearance in the courtroom and how she looks at the defendant." He then added, "Just I got the impression she was very sympathetic toward him [defendant] and his posture, his position."

The court proceeded to deny the renewed *Batson-Wheeler* motion with these comments, "All right. Mr. Landswick, I'll deny the motion this time, but if you excuse another female, you'd better be able to point to me with articulable facts other than they are sympathetic to the defendant. You can say that—Most of these women that you excused by their answers and by the way they talked, it's arguable that they were sympathetic to the defendant, the defendant being black. But if you're going to excuse another black female, I want some articulable facts that they—either answers they made, answers they made on the record or something they said on the record that leads you to that conclusion." The prosecutor signaled his understanding to the court. The court added, "Otherwise, that's going to be the end of the ballgame." The prosecutor responded again, "Okay, Your Honor."

We have examined the transcript of the voir dire of Tanjala S., as well as the transcript of the hearing on the new trial motion at which the prosecutor sought once again to explain her peremptory challenge. Although at the time

---

[8] The voir dire of Prospective Juror Tanjala S. had been conducted on March 5, 1991, approximately nine weeks prior to the date she was peremptorily excused and the prosecutor called upon to respond to the *Batson-Wheeler* motions.

the *Batson-Wheeler* motion was entertained both the court and the prosecutor, having quickly reviewed the daily transcript of her voir dire, could point to nothing reflecting her "sympathy" for defendant, our review reveals that several relevant factors were brought to light at her voir dire that do indeed appear to fall within the prosecutor's broad use of the term "sympathy for the defendant."

Tanjala S. was a 24-year-old single parent with a three-year-old child and no prior jury trial or court experience. When asked by the court during her voir dire, "Do you think that you could personally ever vote to execute another human being?," she replied, "That's a hard question." When the court probed further by asking her, "So you think that you have it in you to vote to execute somebody if you thought that person deserved it?," she replied, "I thought about this question a lot, and I still—it's really hard to answer whether you can." In response to a jury questionnaire question about whether she could vote for the death penalty, Ms. S. had replied, "I feel that if the death penalty is imposed on someone, there should be no doubt at all that the defendant is guilty."

In arguing against a new trial, the prosecutor explained, "My burden was not to prove absolute certainty. My burden was to prove beyond a reasonable doubt, and I felt that she would require a higher burden on my part to convict the defendant before we could get into the penalty phase where she would have to be persuaded to resolve a very difficult question." Although Tanjala S. had also suggested during her voir dire that she could vote for the death penalty, "If I were persuaded. I'd have to be persuaded," her responses quoted above nonetheless reflect a valid basis for the prosecutor's concerns later articulated at the hearing on the motion for a new trial.

The prosecutor stated further at that hearing, "And, also, in my analysis of Tanjala [S.], when I said that she had appeared and there was an appearance and the way she appeared to me, she also said that if a person killed eight people that the death penalty might be warranted. [¶] My case involved the death of one and the attempted killing of another, and I felt that she may be sympathetic toward the defendant because he was not a mass, multiple murderer."

Here again, Tanjala S.'s voir dire responses reflect the basis for the prosecutor's concerns. She volunteered during her voir dire, "Now if you've sat there and murdered eight people or something like that, you don't deserve to live. I mean, I think it's warranted in that case. But it depends on the case and it depends on the crime, I'm sure." When the prosecutor followed up by asking her, "You mean the severity of the crime or like the planning or what?," she responded, "The severity. I mean, was it premeditated or was it

just something, an accident or—it depends on." She also revealed her belief that there was little if any difference between the death penalty and life without the possibility of parole when she stated, "[E]ither way—I mean, he's going to either die in jail or ·he is going to die in the gas chamber." When the prosecutor probed further by asking her, "Which of the two, Ms. [S.], do you feel is worse, or do you feel they are equally as bad?," she replied, "They are equally as bad. One is just quicker. It's the same thing, actually, but, you know."

Although these responses may not necessarily reflect "sympathy for the defendant [Stanley]" *personally*, they do fall within the prosecutor's broad use of that term as his shorthand notation for sympathetic or prodefense biases revealed by Tanjala S. and the other excused prospective jurors during their voir dire. In sum, the record as a whole confirms that the prosecutor had race-neutral reasons for his peremptory excusal of each of the prospective jurors scrutinized in connection with the *Batson-Wheeler* motions. That the prosecutor, in the press of responding to the motions, had some difficulty articulating all the circumstances leading to his assessment of the prospective jurors weeks or months after completion of their individual voir dire does not detract from this conclusion. We conclude the *Batson-Wheeler* motions were properly denied.

### B. *Guilt Phase Issues*

#### 1. *Refusal to give CALJIC No. 3.40 (proximate cause instruction)*

Defendant argues the court deprived him of due process and a fair trial when it refused his request to give CALJIC No. 3.40, which he characterizes as a "pinpoint instruction" that "would have directed the jury's attention to the question of whether [defendant's] actions were the proximate cause of [Rubalcava's] death."[9] Specifically, he argues that "[s]ubstantial evidence was admitted at trial supporting an inference that Rudy Rubalcava died of complications suffered after the knife attack and due to the failure to provide him with competent and adequate medical care." At the time of his autopsy, Rubalcava weighed approximately 90 pounds more than what was believed to be his normal weight. The defense argued that his death was caused by unforeseeable medical malpractice, which supposedly occurred after he was stabbed.

---

[9] The version of CALJIC No. 3.40 in effect at the time of trial would have told the jury that, "To constitute the crime of _____ there must be in addition to the _____ an unlawful act which was the proximate cause of that _____. [¶] A proximate cause of the _____ is a cause which, in natural and continuous sequence, produces the _____ and without which the _____ would not have occurred."

■ Pinpoint instructions must be given on request only when there is evidence to support them. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Here, Dr. Badger, who performed the surgeries on Rubalcava, testified he died of cardiorespiratory arrest as a result of continued bleeding from his multiple stab wounds. Dr. Rogers, who performed the autopsy, likewise testified the cause of death was multiple stab wounds and incised wounds. Rubalcava lost seven quarts of blood as a result of the stabbing attack. As a result of the quantity of fluids required to be pumped into his body in the effort to keep him alive, and his poor urine output, Dr. Badger indicated he was not surprised by Rubalcava's weight gain, which Dr. Rogers detected during the autopsy and similarly characterized as bloating from retention of liquids, a condition known as edema. Significantly, neither medical expert listed that condition as a cause of death.

■ In short, the evidence established that Rubalcava died from his stab wounds inflicted by defendant, and that his retention of fluids and consequent weight gain at the time of death was a medically foreseeable and explainable condition that resulted from the attempt to keep him hydrated and alive. "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death." (*People v. Roberts* (1992) 2 Cal.4th 271, 312 [6 Cal.Rptr.2d 276, 826 P.2d 274]; see *People v. McGee* (1947) 31 Cal.2d 229, 240 [187 P.2d 706].) It was thus not error to refuse defendant's requested "pinpoint" proximate cause instruction. Even if we were to conclude otherwise, given the extent and nature of the stab wounds inflicted on the victim by defendant, any such error would necessarily be harmless. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1112 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

### 2. *Juror misconduct (newspaper article covering opening statements)*

On May 16, 1991, the second day of trial, it was brought to the court's attention that an article had appeared in that morning's edition of the Oakland Tribune describing the opening statements that had been presented in defendant's trial the previous day. The article mentioned that, "A prosecutor yesterday began the trial of an ex-convict by weaving a tale of the defendant's two-month string of Oakland robberies that included the killing of a popular bartender." The article also indicated defendant "has served time in state prison for burglary." Finally, the article described a colloquy between defendant, the prosecutor, and the court concerning the *Batson-Wheeler* motion that had been made during jury selection: "At the start of yesterday's proceeding, Stanley personally complained to Judge Alfred Delucchi that the prosecutor had excluded most of the black potential jurors from serving on the panel. [¶] 'My life is on the line because this is a death penalty case and

the makeup of the jury is unfair,' he told the judge. [¶] The jury includes one black man among the 12 regular jurors and two of the three alternates are black people. [¶] Looking directly at Stanley, [Deputy District Attorney] Landswick responded that 'you don't deserve anything special because you're black . . . . You only deserve a fair trial and I'll do my best to see that you get that.' [¶] The prosecutor also explained that some of the potential black jurors were excused because they indicated they had a certain compassion for Stanley because of his race."

One juror, James C., had read the article. The court proceeded to examine him outside the presence of the other jurors as follows:

"THE COURT: And we have Juror Number One, Mr. [C.], here having apparently read the article in the paper this morning. [¶] Mr. [C.], can you—can you tell us what you read or what you recall reading in the newspaper?

"[JUROR C.]: Well, I remember that Will—I can't remember who wrote it.

"THE COURT: Will Jones?

"[JUROR C.]: Will Jones. Okay. [¶] And they surveyed, I guess, what had actually happened by the opening comments of both men, the prosecution and the defendant attorneys. And I thought there was nothing that hadn't—I was pleased that it was pretty factual for what actually had happened, I thought.

"THE COURT: Yeah. Do you recall reading any comments in the paper about the defendant at all other than the statements he may have made to the Court?

"[JUROR C.]: No, no. I only—No. I thought—Actually, I read the Tribune. I thought it was a pretty good report of what had happened yesterday, accurate, I should say.

"THE COURT: Do you recall whether or not there was any allegations as to whether or not the defendant has any prior convictions?

"[JUROR C.]: No, I didn't.

"THE COURT: Okay.

"[JUROR C.]: I've not heard that at all any place.

"THE COURT: Okay. And you have no independent recollection of ever reading anything like that in the article?

"[JUROR C.]: No.

"THE COURT: Okay."

The court then permitted Defense Counsel Hove to ask the juror if he recalled any reference in the article to a discussion of the racial composition of the jury:

"[DEFENSE COUNSEL]: In regards to the article, did you notice or do you recall whether or not, in reading it, there was any reference to the fact of the race of Mr. Stanley and as to whether or not he would get a fair trial, comments going back and forth between he and the prosecutor, Mr. Landswick?

"[JUROR C.]: I don't remember anything about race. I remember that there was a quote in there—I'm not sure of who was quoted or who was stated, but yes, I thought it was the Judge said that he was out to see that he got a fair trial. I'm not sure who was quoted by that.

"THE COURT: But you have no independent recollection about any reference being made to race?

"[JUROR C.]: No, I don't.

"THE COURT: Okay, Anything else?

"[DEFENSE COUNSEL]: From what you read—obviously you've heard only one witness in this case and the opening statements that were made.

"Did you have—reading the article have any effect on you after you've heard that one witness, Dr. Badger?

"[JUROR C.]: I don't even remember that he was—that he was mentioned. I don't remember that. I just remember that the opening arguments were sort of summarized. That's really what I remember. And I thought it was accurately reproduced.

"THE COURT: Reproduced?

"[JUROR C.]: Yes.

"[DEFENSE COUNSEL]: Would you say you read the article more than one time?

"[JUROR C.]: Oh, no.

"[DEFENSE COUNSEL]: Okay. And would that have been—

"[JUROR C.]: I read the whole paper.

"[DEFENSE COUNSEL]: You read the whole paper?

"[JUROR C.]: Yeah. Almost all of it, yes.

"[DEFENSE COUNSEL]: I don't know. Was there any discussion up there in the jury room with any of the other jurors about the fact that there was, in fact, an article in the paper?

"[JUROR C.]: No, there was no discussion.

"It wasn't brought up at all.

"[DEFENSE COUNSEL]: Thank you."

The court concluded its inquiry of Juror C. with the following two questions:

"THE COURT: Is there anything that you may have read reciting the events that took place yesterday in this courtroom that you think might affect your ability to be a fair juror in this case?"

"[JUROR C.]: No.

"THE COURT: You could still sit here and listen to it and call it the way you see it, correct?

"[JUROR C.]: Yes."

The court permitted Mr. C. to remain seated on the jury, and gave the following admonishment to the jurors: "Now Ladies and Gentlemen of the Jury, because the article has now appeared in the Tribune and it may appear in some of the other papers—and I don't know whether its going to appear or not or be presented or not on TV—but in the interest of fairness, I want to advise you now that if you see any reference to this trial in any of the media—It's on TV, turn it off. If you see any newspaper articles about this

trial, I want to caution you now please don't read those newspaper articles because what we want you to do is to decide this case only on what you hear in the courtroom, and we don't want you to be—to use the word—and I don't mean it to be sarcastic—we don't want you to be polluted by some outside information that may or may not be correct."

Juror C.'s reading of the newspaper article, and "his inadvertent receipt of information outside the court proceedings," was misconduct giving rise to a rebuttable presumption of prejudice. (*People v. Zapien* (1993) 4 Cal.4th 929, 994 [17 Cal.Rptr.2d 122, 846 P.2d 704]; see also *People v. Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].) " ' "[W]hether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecutor's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed. On the other hand, since jury misconduct is not per se reversible, if a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct a reversal is not compelled." [Citation.]' (*People v. Williams* (1988) 44 Cal.3d 1127, 1156 [245 Cal.Rptr. 635, 751 P.2d 901].)" (*Zapien,* at p. 994.)

At the outset, we note defendant has conceded that his counsel failed to object to Juror C.'s continued service on the jury, and failed to request a mistrial on grounds of juror misconduct. As such, the claim is waived on appeal. (*People v. Billings* (1981) 124 Cal.App.3d 422, 433 [177 Cal.Rptr. 392], overruled on other grounds in *People v. Karis* (1988) 46 Cal.3d 612, 642, fn. 22 [250 Cal.Rptr. 659, 758 P.2d 1189]; see *People v. Lucas* (1995) 12 Cal.4th 415, 486–487 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Juror C. was the only juror who read the article; he confirmed there had been no discussion with any of the other jurors about the fact that an article about the case had appeared in the morning paper. In response to the court's and counsel's questioning, he indicated he had no recollection of having read anything about defendant's prior criminal record, or about defendant having discussed the racial makeup of the jury with the court. Juror C. read through the article only once, and recalled that it "sort of summarized" the opening arguments, "That's really what I remember. And I thought it was accurately reproduced." He further indicated nothing he read would affect his ability to be a fair juror in the case. After ruling that Juror C. could remain seated on the jury, the court admonished the jury, "in the interest of fairness," to avoid "any reference to this trial in any of the media," including any newspaper articles that might appear about the trial, "because what we want you to do is to decide this case only on what you hear in the courtroom . . . ."

Defendant suggests that, "While it is true that [Mr. C.], when questioned, specifically denied recalling any reference to [defendant's] past convictions or [his] complaint concerning the racial composition of the jury . . . these denials defy all logic and credibility." Defendant urges us to reject Juror C.'s responses as lacking in credibility and to find instead that the juror read the article "in such a manner as to conveniently forget the highly prejudicial matters" contained therein. To the contrary, normally "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87]; see also *People v. Pride* (1992) 3 Cal.4th 195, 260 [10 Cal.Rptr.2d 636, 833 P.2d 643].) We may not substitute our reading of the "cold transcript" in this case for the credibility determinations reached by the trial court after making its inquiry, observing the juror, and listening to his responses. (*Abbott v. Mandiola* (1999) 70 Cal.App.4th 676, 682–683 [82 Cal.Rptr.2d 808].) We find those credibility determinations supported by substantial evidence and conclude the presumption of prejudice from the juror misconduct has been rebutted in this case.

### 3. *Prosecutorial misconduct (guilt phase closing arguments)*

Defendant next contends the prosecutor committed misconduct during his guilt phase rebuttal closing argument by making improper and disparaging remarks about defendant and defense counsel, and by presenting improper arguments on fingerprint evidence and on the cross-admissibility of evidence in the case. We find no prejudicial misconduct on this record.

■ " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza, supra*, 3 Cal.4th at p. 820.)' (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)" (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■ Regarding the scope of permissible prosecutorial argument, " ' "a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in

evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " ' (*People v. Wharton* [(1991)] 53 Cal.3d [522,] 567–568 [280 Cal.Rptr. 631, 809 P.2d 290].)" (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

■ Finally, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].)" (*People v. Samayoa, supra,* 15 Cal.4th at p. 841 (*Samayoa*).)

Defendant complains that the prosecutor committed misconduct during his guilt phase rebuttal argument when he told the jury that defense counsel "imagined things that go beyond the evidence" and told them a "bald-faced lie." Although defense counsel lodged objections to these remarks, he failed to further request admonitions that could have cured any harm, thereby waiving the claim on appeal. (*People v. Montiel* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

We have examined the record and conclude the prosecutor's remarks were merely responsive to defense counsel's own arguments to the jury on the state of the evidence. Prosecution witness Fred Stewart testified he saw defendant in possession of a Buck knife on the night before Rubalcava's robbery murder, that it appeared a little thinner than the Buck knife later received into evidence in connection with those crimes (People's exhibit No. 2), and that it did not have a broken tip. Stewart was unwilling to state, on cross-examination, that People's exhibit No. 2 was not the knife he had seen in defendant's possession. Defense counsel's suggestion to the jury that the Buck knife in evidence was not the knife Stewart had seen in defendant's possession, and his further suggestion that the knife Stewart described was "more like a stiletto," are what prompted the prosecutor, in his rebuttal argument, to tell the jury counsel "imagined things that go beyond the evidence," and that he had told them a "bald-faced lie." The prosecutor's argument, although intemperate in tone, did little more than urge the jury not to be influenced by counsel's arguments, and to instead focus on the testimony and evidence in the case. (See *People v. Gionis, supra,* 9 Cal.4th at p. 1216.)

We reach the same conclusion regarding the prosecutor's suggestion to the jury that defense counsel was on an "imaginary trip" when he summarized

the testimony of Lakesha Potts, one of the girls who recovered attempted murder victim Fakoury's wallet moments after defendant fled the scene of that attack. Defense counsel argued to the jury that the witness had described Fakoury's assailant as having "no facial hair . . . whatsoever." In fact, Potts testified she told a police sketch artist that the man "had hair on the face." Although the prosecutor somewhat intemperately suggested defense counsel was on an "imaginary trip" when summarizing the witness's testimony for the jury, the prosecutor also told the jury, "It's for you to resolve. But the point is, is that wherever that came from, that there was no facial hair on that person, *it's not the evidence*." (Italics added.) When the court suggested to the prosecutor that it would be more "correct" to refer to defense counsel's argument as an "exaggeration," the prosecutor responded, "Fair enough." When the court added, "Or an unreasonable inference," the prosecutor replied, "That's even better, your Honor." The prosecutor's argument in this regard did not rise to the level of misconduct.

Defendant also contends the prosecutor improperly argued facts not in evidence in his attempt to rebut defense counsel's argument that the absence of defendant's fingerprint on one of the knives in evidence established he had not handled the knife. Defendant's failure to object to the argument or seek a curative admonition has waived the claim on appeal. (*Samayoa, supra,* 15 Cal.4th at p. 841; *People v. Gionis, supra,* 9 Cal.4th at p. 1215.) In any case, the prosecutor was merely expounding on the testimony of the fingerprint expert who testified not everyone who handles an object will leave discernable fingerprints on the object.

Defendant also complains that the prosecutor's description of him as "cold-blooded," "a person with no soul," and someone "with no remorse" was misconduct that improperly encouraged the jury to find him guilty based on his mere propensity to commit crime. We do not find these comments rose to the level of misconduct given the brutal and violent nature of the stabbing murder and attempted murder, and other violent crimes of which defendant was convicted. Nor do we agree with defendant that the prosecutor committed misconduct by arguing certain evidence was cross-admissible for the purpose of establishing defendant's guilt of one or more of the other charged offenses. We have explained that the evidence was cross-admissible. In any case, neither claim was preserved for appeal with an appropriate objection. (*Samayoa, supra,* 15 Cal.4th at p. 841.)

### 4. *Ineffective assistance of counsel at the guilt phase*

Defendant argues reversal is required due to ineffective assistance of counsel at the guilt phase. He faults counsel in four respects: for failing to move to excuse Juror C. based on his misconduct in reading the newspaper

article on the second day of trial; for failing to object to the asserted instances of prosecutorial misconduct or to request curative admonitions; and for failing to request a limiting instruction to prevent or limit the jurors' consideration of evidence as between the various counts. Defendant further faults counsel for failing to follow through on a representation made in his opening statement to call an Oakland police officer as a witness to testify regarding another robbery of an Oakland cab driver that occurred while defendant was in custody.

The standard for establishing ineffective assistance of counsel is well settled. A defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]. 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925–926 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

Notwithstanding defendant's failure to object to the alleged instance of juror misconduct, we have examined the claim on the merits and determined that the presumption of prejudice arising from the juror's improper reading of the newspaper article was rebutted. We have also shown why none of the alleged claims of improper prosecutorial argument to the jury, which for the most part involved the prosecutor's use of intemperate remarks or language in commenting on the state of the evidence, rose to the level of misconduct. Finally, we have explained why the evidence defendant claims was not cross-admissible in fact was. We conclude defendant has not demonstrated prejudice from counsel's alleged omissions in these three respects. (See *People v. Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Last, defendant faults his counsel for failing to follow through on a representation made in his opening statement to present the testimony of an Oakland police officer regarding the robbery of another cab driver that allegedly was committed in defendant's neighborhood, by someone matching

his description, while he was in custody. Whether the failure to produce a promised witness amounts to ineffective assistance of counsel is a fact-based determination that must be assessed on a case-by-case basis. (See *United States v. McGill* (1st Cir. 1993) 11 F.3d 223, 227.) Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case. (*Turner v. Williams* (4th Cir. 1993) 35 F.3d 872, 904; *United States ex rel. Johnson v. Johnson* (3d Cir. 1976) 531 F.2d 169, 177.)

On this record, even were we to conclude counsel's failure to present the witness and testimony described in his opening statement had no tactical justification and fell below the normal range of competency, we would find such error nonprejudicial. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].) There is no reason to assume the jury necessarily concluded counsel was unable to produce the witness, or that the failure to produce the witness meant defendant was the only possible suspect in the robberies of cab drivers Adelaja, Cheatham and Dollison, or that the jury indeed based its guilty verdicts on the failure of the defense to produce the witness, contrary to the instructions they were sworn to follow. Defendant's reliance on *Anderson v. Butler* (1st Cir. 1988) 858 F.2d 16 (*Anderson*) is misplaced. In *Anderson*, defense counsel made his opening statement *after* the prosecution rested its case-in-chief, and the very next day the defense rested without presenting the promised expert witness testimony. Under those particular circumstances, the *Anderson* court concluded the failure to produce the promised expert witness testimony likely altered the outcome of the case. (*Id.* at pp. 17–19.) Here, in contrast, the defense rested its guilt phase case nearly three weeks after delivering its opening statement. Given the strength of the evidence against defendant on all charged counts, we conclude counsel's failure to present the police witness testimony referred to in the opening statement did not prejudice the guilty verdicts. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 216–218.)

### 5. *Cumulative effect of guilt phase errors*

Defendant contends that the cumulative effect of all the guilt phase errors he has identified requires reversal. (See, e.g., *People v. Hill, supra,* 17 Cal.4th at pp. 844–845.) Because we have found no appreciable error at the guilt phase, other than the presumptively prejudicial juror misconduct which we have found was satisfactorily rebutted, there is no cumulative prejudice to assess. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1150 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

### C. *Special Circumstance Issues*

#### 1. *CALJIC No. 8.81.17 (robbery-murder special circumstance)*

Defendant correctly notes that the felony-murder (robbery) special-circumstance instruction given below contained a one-word error that resulted in the first and second paragraphs of the instruction being stated in the disjunctive ("or") rather than the conjunctive ("and"). The trial court charged the jury with the following version of CALJIC No. 8.81.17:

"To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved:

"1a. The murder was committed while the defendant was engaged in the commission or attempted commission of a robbery or

"1b. The murder was committed during the immediate flight after the commission of a robbery by the defendant *or*

"2. The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder." (Italics added.)

Defendant contends the insertion of the disjunctive "or" between paragraphs 1b and 2 of the instruction effectively omitted the intent element of the special circumstance instruction. Although we acknowledge the instructional error, we conclude it was nonprejudicial given the delivery of another specially requested defense instruction as well as the closing arguments of both the prosecutor and defense counsel.

Paragraph 2 of CALJIC No. 8.81.17 is addressed to this court's decision in *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*), wherein we held that "the felony-murder special circumstance is 'inapplicable to cases in which the defendant intended to commit murder and only incidentally committed one of the specified felonies while doing so.' [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 902 [8 Cal.Rptr.2d 678, 830 P.2d 712] (*Raley*).) It is merely a clarifying clause, and does not purport to state or add an additional element to the felony-murder (robbery) special circumstance. (See *People v. Kimble* (1988) 44 Cal.3d 480, 501 [244 Cal.Rptr. 148, 749 P.2d 803].) It explains to the jury that in order for the felony-murder (robbery) special circumstance to apply, the murder must be committed while the defendant was engaged in robbery or attempted robbery (or immediate

flight after commission of the robbery), and not the other way around, that is to say, not if the defendant intended to commit murder "and only incidentally committed [the robbery]" while doing so.

The erroneous insertion of the disjunctive "or" instead of "and" between paragraphs 1b and 2 of the instruction did not, however, prevent the jury from properly drawing the distinction between felony-murder robberies that qualify for special circumstance treatment, and intentional murders during which a robbery is "only incidentally committed," which do not. This is so because the court also charged the jury with a special instruction requested by the defense, which told them, "If you find that the intent to rob in this case did not arise until after the force had been used against this victim (Rubalcava), then there is no joint operation of act and intent to find a felony murder, and such would be a defense to the special circumstance allegation."

The special defense instruction itself required the jury to resolve the factual question implicated by our holding in *Green, supra,* 27 Cal.3d 1, and posed in the first sentence of paragraph 2 of CALJIC No. 8.81.17. It required the jury to find that "[t]he murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection" before the felony-murder special circumstance could be found true.

The record also reflects that the trial court delivered additional clarifying remarks in conjunction with defendant's specially proposed instruction that further served to cure any error. After charging the jury with CALJIC No. 8.81.17 and defendant's specially requested instruction, the court told the jury, "In other words, you're going to have to find that if Mr. Rubalcava was killed that at the time he was killed the defendant or whoever had committed the crime had the specific intent to commit the robbery. If you find that Mr. Rubalcava was killed and then the perpetrator decided, well now I'm going to rob the guy, then you don't have—you don't have a [felony-murder] special circumstance because then the thought for the robbery came after the force was used."

The prosecutor and defense counsel likewise properly conveyed the *Green* requirement to the jury in their closing arguments. The prosecutor argued, "Special circumstance is not established if the robbery was merely incidental to the commission of the murder. [¶] What that means, Ladies and Gentlemen, is—is if you find that the defendant was not engaged in a robbery and killed but find that the defendant simply intended to murder Mr. Rubalcava and then after he murdered him he took his wallet, you cannot return this special circumstance to be true if you find that." Defense counsel argued, "In order for Mr. Landswick to convince you beyond a reasonable doubt and to a

moral certainty, he is going to have to show you that somehow Mr. Stanley had the specific intent to rob Mr. Rubalcava and went over to the gas station with that purpose and in the course of that Mr. Rubalcava was killed. . . . If anything different is shown, you don't have felony murder, and you have to find the special circumstance that's alleged as not true." He later added, "To show felony murder you have to show an intent to commit a felony and then a death resulting therefrom."

In sum, although defendant has correctly identified instructional error under state law (*Raley, supra,* 2 Cal.4th at p. 903), it did not rise to the level of federal constitutional error, as defendant would have us conclude, and it was clearly harmless under any standard, given delivery of the specially requested defense instruction and counsel's closing arguments. (*Raley,* at p. 904; *People v. Clark* (1990) 50 Cal.3d 583, 609 [268 Cal.Rptr. 399, 789 P.2d 127].)

### 2. *Death eligibility and intent to kill*

Defendant contends the trial court should have instructed the jury that specific intent to kill is an element of the felony-murder (robbery) special circumstance under which he was found death eligible. Such instruction would have been appropriate under this court's holding in *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], which holding, defendant recognizes, was later overruled in *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], in which case we held that intent to kill is *not* an element of the felony-murder special circumstance if the defendant is the actual killer. Defendant asks us to reconsider *Anderson,* proffering the same arguments we have rejected in past cases. (See, e.g., *People v. Visciotti* (1992) 2 Cal.4th 1, 62 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People v. Belmontes* (1988) 45 Cal.3d 744, 794–795 [248 Cal.Rptr. 126, 755 P.2d 310].) He presents us with no reason to depart from those precedents.

### D. *Penalty Phase Issues*

#### 1. *Prosecutorial misconduct*

Our discussion of the principles governing defendant's guilt phase prosecutorial misconduct claims apply as well to his claims of penalty phase misconduct.

##### a. *Questioning of witnesses*

Defendant contends the prosecutor committed misconduct when he asked Officer Emberton how he "felt" about defendant when he encountered him as

a juvenile, and the officer responded, "I felt that at some point Mr. Stanley was going to kill someone." Defendant argues such comment improperly placed before the jury inadmissible evidence of his future dangerousness. (See *People v. Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446].) Because there was no objection or request for a curative admonition, this claim of prosecutorial misconduct is waived on appeal. (*People v. Garceau* (1993) 6 Cal.4th 140, 205–206 [24 Cal.Rptr.2d 664, 862 P.2d 664].) In any event, *Murtishaw* specifically held that expert testimony furnishing psychological predictions of a defendant's propensity for future violence are inadmissible because their probative value is outweighed by the potential for prejudice. (*Murtishaw*, at p. 773.) Here Officer Emberton's testimony was not expert opinion testimony offered to predict defendant's future dangerousness, and was therefore not the type of evidence prohibited by *Murtishaw*.

Defendant claims the prosecutor's questioning of Officer Burnham about the incident in which certain papers covering defendant's cell window were removed, leading to an altercation with defendant, was misconduct because it was designed to elicit prejudicial testimony about defendant's posting of anti-White materials on his cell window. We cannot agree. The prosecutor was rightfully seeking to rebut the defense claim that Officer Burnham had been harassing defendant by soliciting the officer's testimony regarding the real reason for defendant's violent reaction.

Nor do we find that the prosecutor committed misconduct when he questioned a defense expert, Dr. Pierce, for the purpose of establishing that his expert opinion testimony was not based on any of defendant's California Youth Authority (CYA) records, which Dr. Pierce had not seen or reviewed. The defense had sought and obtained an in limine order preventing the prosecutor from questioning Dr. Pierce on the *substance* of the CYA records that he never reviewed. But as the court and parties appeared to appreciate, the prosecutor remained free to question Dr. Pierce for the limited purpose of establishing exactly what records he had relied on to form his opinions. The questioning of the witness for that specific purpose was not misconduct. Neither the trial court's order nor defendant's due process rights were violated by the prosecution's questioning of Dr. Pierce for this limited purpose.

b. *Closing arguments*

Defendant argues the prosecutor committed five instances of prejudicial misconduct during his closing arguments. None were objected to, nor were curative admonitions sought. As such, defendant has waived the claims on appeal. (*People v. Sanders* (1995) 11 Cal.4th 475, 550 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Garceau, supra,* 6 Cal.4th at pp. 205–206.)

We have reviewed the record and conclude none of the claimed instances of misconduct has any merit. For the same reasons we did not find the questioning of Officer Burnham to be misconduct, the prosecutor's argument to the jury summarizing the officer's testimony was not misconduct, but rather was fair comment on the evidence. Officer Burnham testified, *without defense objection*, that defendant had covered his cell window with writings that "were volatile in nature" and could lead to jail security problems. The prosecutor's characterization of this testimony in his arguments was not improper.

Nor was it misconduct for the prosecutor to argue to the jury regarding the basis for defense witness Dr. Pierce's testimony about defendant's personality assessment and profile. The prosecutor could properly argue the profile compiled by Dr. Pierce did not contain any mitigating information in defendant's favor, and could seek to challenge the basis for the doctor's conclusion that defendant was not able to appreciate the criminality of his conduct or conform his behavior to the law due to his cocaine addiction. All of the remarks made during closing arguments that defendant would now assign as prosecutorial misconduct appear to have been fair comment on the state of the evidence and, specifically, Dr. Pierce's testimony.

 The prosecutor clearly committed no misconduct in arguing to the jury that defendant felt no remorse for his crimes. The prosecutor was entitled to comment on the *absence of evidence of remorse (People v. Sims* (1993) 5 Cal.4th 405, 465 [20 Cal.Rptr.2d 537, 853 P.2d 992]), and we find nothing in his arguments that would have improperly suggested to the jury that defendant's *lack of remorse* was itself an aggravating factor. (Cf. *People v. Keenan* (1988) 46 Cal.3d 478, 508–509 [250 Cal.Rptr. 550, 758 P.2d 1081].)

Last, the prosecutor invoked the teachings of philosophers Aristotle, Kant, and Neier in an attempt to articulate for the jury several time-worn philosophical views on the social value and function of criminal punishment. He indicated Aristotle had stated, "The power to do includes the power not to do," and told the jury defendant had the power to kill or not kill; that many of his victims begged him not to rob or kill them, but that he "went ahead anyway and he bragged about it." He indicated Kant had said, "[T]he last murderer on an empty earth needs to be punished." And he paraphrased civil libertarian Aryeh Neier, whose response to "the foolishness of utilitarian talk" (i.e., "What good does it do to punish because you can't bring Mr. Rubalcava back to our community?"), the prosecutor suggested, would have been, "You destroy your community sense of justice if you are allowed to forgive. Only Rubalcava is allowed to forgive. You have the responsibility to see that justice is done for Rubalcava." The prosecutor concluded this line of argument by paraphrasing a statement he attributed to Neier, to the effect that,

"[I]t requires that the duty to punish must be assumed by everyone other than the victim. [¶] That is what is meant by the rule of law, and that would cause you to return verdicts of death against Darren Stanley."

Significantly, we see nothing in the prosecutor's arguments that would suggest or imply to the jury that they should follow another, "higher law," rather than the law embodied in the court's instructions. (Cf. *People v. Wash* (1993) 6 Cal.4th 215, 259–261 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) The prosecutor was not suggesting, for instance, that the Bible, separate and apart from the law, demands the death penalty. He was instead merely encouraging the jurors to embrace the philosophy that, as members of society, we are all collectively responsible to see that justice is served and the rule of law implemented.[10]

### 2. *Defendant's voluntary absence from courtroom during Isaac Stanley's testimony*

During the testimony of his brother, Isaac Stanley, in defendant's behalf at the penalty phase, defendant elected to voluntarily absent himself from the courtroom. He now claims the trial court erred in allowing him to absent himself from the courtroom, that the court had a sua sponte duty to give a cautionary admonition advising the jurors not to draw any adverse inferences from his departure, and that his absence from court on that occasion compromised the reliability of his death sentence. Defendant fails to state a claim for relief in this regard. We have in past cases rejected the argument that a defendant can never waive his or her presence during the taking of evidence at trial. (*People v. Mayfield* (1997) 14 Cal.4th 668, 738 [60 Cal.Rptr.2d 1, 928 P.2d 485]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1209–1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

### 3. *CALJIC 2.60 (instruction on defendant's failure to testify)*

Defendant argues the court had a sua sponte duty to reinstruct with CALJIC No. 2.60 at the penalty phase, thereby telling the jury not to draw an adverse inference from the circumstance of his failure to testify at that phase of trial. He suggests that because the jury was also instructed at the penalty phase to disregard the guilt phase instructions (see CALJIC No. 8.84.1), they must have disregarded the instruction admonishing them not to draw an adverse

---

[10] Defendant also claims that section 190.3 required the prosecutor to give the defense notice of aggravating evidence that would be referenced in his *closing arguments*. "It is axiomatic that argument is not evidence." (*People v. Breaux* (1991) 1 Cal.4th 281, 313 [3 Cal.Rptr.2d 81, 821 P.2d 585].) No advance notice of the prosecution's penalty phase arguments, as opposed to its penalty phase evidence, was required. (See *People v. Champion* (1995) 9 Cal.4th 879, 942 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

inference from his failure to testify. The claim, however, has been rejected in many of this court's past decisions. (See, e.g., *People v. Hardy* (1992) 2 Cal.4th 86, 209 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Morales* (1989) 48 Cal.3d 527, 569–570 [257 Cal.Rptr. 64, 770 P.2d 244].) We have no occasion to reconsider those holdings here.

### 4. *Admission of evidence of prior unadjudicated crimes*

Defendant contends that permitting his jury to consider prior unadjudicated crimes at the penalty phase violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He acknowledges this court has repeatedly rejected the claim. (See, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 335 [75 Cal.Rptr.2d 412, 956 P.2d 374], and cases cited.) There is no good cause to revisit it here.

### 5. *CALJIC No. 8.85*

Defendant argues CALJIC No. 8.85 is constitutionally flawed because it fails to inform the jury that factors (d) ("extreme mental or emotional disturbance") and (h) of section 190.3 ("mental disease or defect or the effects of intoxication") can only be utilized as mitigating factors, and because the "whether or not" formulation in the instruction permits the jury to improperly consider those mitigating factors, when unproved, as circumstances in aggravation. We have consistently rejected this claim. (See, e.g., *People v. Dennis* (1998) 17 Cal.4th 468, 552 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321] (*Fairbank*).) Defendant furnishes no persuasive reason to reconsider it here.

### 6. *Failure to instruct that absence of mitigating factor not aggravating*

In *People v. Livaditis* (1992) 2 Cal.4th 759 [9 Cal.Rptr.2d 72, 831 P.2d 297] (*Livaditis*), this court held that the trial court is *not* required to instruct the jury that the absence of a mitigating factor is not itself aggravating unless "the court or parties make an improper contrary suggestion." (*Id.* at p. 784; see also *People v. Williams, supra,* 16 Cal.4th at pp. 269–271.) We have already concluded, in rejecting defendant's allegations of penalty phase prosecutorial misconduct, that the prosecutor did not suggest or argue that the absence of mitigating evidence could itself be considered aggravating. Defendant's argument to the contrary, and his claim that the *Livaditis* exception should have been applied to his case, is therefore without merit.

### 7. *Factor (d) (extreme mental or emotional disturbance)*

Defendant argues that the inclusion of factor (d) ("extreme mental or emotional disturbance") in the list of mitigating factors under section 190.3

(and in CALJIC No. 8.85) unconstitutionally precludes the jury from considering mental or emotional disturbance that is less than "extreme" in mitigation of penalty. We long ago rejected this contention, explaining that factor (k), the so-called catchall provision, is the statutory factor under which " 'consideration of nonextreme mental or emotional conditions' " is clearly permitted. (*Turner, supra,* 8 Cal.4th at p. 208; see also *People v. Nicolaus* (1991) 54 Cal.3d 551, 586 [286 Cal.Rptr. 628, 817 P.2d 893].)

### 8. *CALJIC No. 8.88 (penalty trial concluding instruction)*

Defendant argues that CALJIC No. 8.88, the standard penalty phase concluding instruction, should not have been given because it is "death oriented" in that it fails to convey that one mitigating factor, standing alone, may be sufficient to outweigh all other aggravating factors. We have previously rejected this precise claim. (See *People v. Berryman, supra,* 6 Cal.4th at pp. 1099–1100.) We have no grounds to reconsider it here.

### 9. *Unanimous agreement on aggravating factors*

Defendant argues his jury was constitutionally required to achieve unanimity as to aggravating factors. We have rejected this claim as well. (*People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).) Unanimity is required only as to the appropriate penalty. (*People v. Anderson* (2001) 25 Cal.4th 543, 590 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

### 10. *Appropriateness of death penalty beyond a reasonable doubt*

Since neither capital defendants nor noncapital defendants have their *penalties* fixed under the "beyond a reasonable doubt" standard of proof, the death penalty does not in that respect violate principles of equal protection. (*People v. Marshall* (1990) 50 Cal.3d 907, 936 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant's claim that the jury must be required to find the death penalty appropriate beyond a reasonable doubt has been repeatedly rejected. (*People v. Stanley* (1995) 10 Cal.4th 764, 842 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Webb* (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779].)

Defendant nonetheless cites the high court's recent decision in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] as requiring that California juries find the death penalty appropriate beyond a reasonable doubt. Not so. In *Ring* the high court held that Arizona's death penalty scheme was unconstitutional "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for

imposition of the death penalty." (*Id.* at p. 609.) In *People v. Prieto* (2003) 30 Cal.4th 226 [133 Cal.Rptr.2d 18, 66 P.3d 1123], we explained that the rationale of *Ring* does not apply to the penalty phase of a capital murder trial in California. (*Id.* at p. 263.) That is because once a defendant has been convicted of first degree murder and one or more special circumstances have been found true under California's death penalty statute, the statutory maximum penalty is already set at death. (*Ibid.*) Thus, the high court's holding in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]—that any facts used *to increase the maximum penalty* must be found by a jury beyond a reasonable doubt—does not apply and, accordingly, its subsequent holding in *Ring* is likewise inapplicable. As we explained in *Prieto*, "Because any finding of aggravating factors during the penalty phase does not 'increase[] the penalty for a crime beyond the prescribed statutory maximum' (*Apprendi, supra,* 530 U.S. at p. 490), *Ring* imposes no new constitutional requirements on California's penalty phase proceedings." (*Prieto, supra,* 30 Cal.4th at p. 263; see also *People v. Ward* (2005) 36 Cal.4th 186, 221 [30 Cal.Rptr.3d 464, 114 P.3d 717]; *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

11. *Instruction on burden of proof/standard of proof for mitigating evidence*

Defendant contends the death penalty law is unconstitutional in that it fails to require the jury to be instructed on certain burdens and standards of proof as to aggravating and mitigating evidence. It is settled, however, that California's death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. (*Brown, supra,* 33 Cal.4th at p. 401; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 510–511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *Fairbank, supra,* 16 Cal.4th at p. 1255.)

12. *Prosecutor's "burden of persuasion" on appropriateness of death penalty*

Defendant argues that the failure to impose upon the prosecution the "burden of persuasion" with respect to the imposition of the death penalty violated his constitutional rights. We have repeatedly rejected the claim (see *People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376]) and have no occasion to reconsider it here.

### 13. *Specific findings on aggravating and mitigating factors*

Defendant claims California's death penalty law is unconstitutional because it does not require the jury to make specific findings indicating the aggravating and mitigating factors relied upon in reaching a death verdict. This court has continually rejected claims that the jury is constitutionally required to make a written statement of findings and reasons for its death verdict. (*People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Cornwell* (2005) 37 Cal.4th 50, 105 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568]; see *People v. Fauber* (1992) 2 Cal.4th 792, 859 [9 Cal.Rptr.2d 24, 831 P.2d 249].) We have no cause to reconsider these decisions here.

### 14. *Ineffective assistance of counsel*

Defendant argues the judgment must be reversed due to ineffective assistance of counsel at the penalty phase. As already explained, in order to establish ineffective assistance of counsel the defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. (*Strickland, supra,* 466 U.S. at pp. 688, 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*)

Defendant claims his counsel was ineffective in failing to request a proper special circumstances instruction, and for failing to object to the version of CALJIC No. 8.81.17 that was given (with disjunctive "or" mistakenly inserted between paragraphs 1b and 2). For the same reasons that led us to reject the claim of prejudicial special circumstance instructional error, we must reject this related ineffective assistance of counsel claim. Defendant cannot demonstrate prejudice from the instructional error complained of; indeed it was the specially proposed defense instruction that cured any error.

Defendant's claim that counsel was ineffective for failing to request an intent to kill instruction under *Carlos v. Superior Court, supra,* 35 Cal.3d 131, borders on the specious. *Carlos* was no longer the law at the time defendant murdered Rubalcava. (See *People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) Because defendant was Rubalcava's actual killer, no intent to kill needed to be shown. Counsel cannot be found ineffective for failing to request an instruction that would have misstated the law.

Defendant's claim that counsel was ineffective for failing to request a rereading of CALJIC No. 2.60 at the penalty phase is likewise unavailing.

The instruction is of only questionable value to the defense since the instruction itself draws attention to the fact that the defendant is not testifying at the same time that it cautions the jury not to draw any adverse inferences from such failure to testify. The failure to request the instruction at the penalty phase may therefore reflect a reasoned tactical decision. (See *People v. Morales, supra,* 48 Cal.3d at p. 570.)

Similarly, counsel may well have had a reasonable tactical decision for eliciting testimony from Officer Burnham regarding the racial content of defendant's writings and cell window coverings. It tended to support defendant's claim that the sheriff's deputies had cause to harass him, which in turn arguably supports his claim that the fights and disciplinary actions that characterized his relationship with the Alameda County Sheriff's Department were not all his doing. Last, counsel cannot be deemed to have fallen below the normal standards of competency in failing to object to alleged instances of prosecutorial misconduct that we have found were either nonexistent or nonprejudicial. In short, all of defendant's ineffective assistance of counsel claims lack merit.

### 15. *Cumulative effect of penalty phase errors*

Defendant contends the cumulative effect of the penalty phase errors requires reversal of the death judgment. We have found no appreciable or prejudicial error at the penalty phase. Accordingly, there is no cumulative effect of penalty phase errors for consideration in this case. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1255 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

### 16. *Intercase/intracase proportionality review*

Defendant asks us to undertake both intracase and intercase proportionality review of his death sentence. The latter is not constitutionally required and this court has consistently declined to undertake intercase proportionality review in past automatic appeals. (See, e.g., *People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*); *People v. Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

We do, however, undertake intracase proportionality review to determine whether imposition of the death penalty in a given case is unconstitutionally disproportionate to the offense and the defendant's personal culpability. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 151 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Accordingly, we have evaluated "whether [defendant's] capital sentence is so 'grossly disproportionate' to the offenses as to constitute cruel or unusual punishment under article I, section 17 of the California Constitution." (*People v. Arias* (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d

980].) A death sentence is grossly disproportionate if it "shocks the conscience and offends fundamental notions of human dignity." (*Livaditis, supra,* 2 Cal.4th at p. 786.)

Defendant, 22 years of age and already with a long criminal history at the time of this violent crime spree, brutally robbed and stabbed one man to death; brutally robbed, stabbed and nearly killed another; robbed another victim in an elevator by beating him unconscious with a hard, blunt object; robbed another victim in a gas station by attacking and beating him in the restroom of the business; and violently robbed three taxicab drivers while holding a knife to their throats and threatening to kill them. We do not find defendant's death sentence so disproportionate to his offenses and to his personal culpability for those offenses as to "shock[] the conscience" or "offend[] fundamental notions of human dignity." (*Livaditis, supra,* 2 Cal.4th at p. 786.)

### 17. *Death penalty statute fails to guide, channel sentencing discretion*

Defendant argues the death penalty statutory sentencing factors embodied in section 190.3 fail to adequately channel or limit the sentencer's discretion in choosing to impose death over life without the possibility of parole. We have previously rejected the claim (see *Hawkins, supra,* 10 Cal.4th at p. 964) and have no good cause to revisit it here.

### 18. *Prosecutorial discretion to charge death penalty unconstitutional*

Defendant argues that prosecutorial discretion to determine in which cases special circumstances will be charged and the death penalty sought renders the death penalty law unconstitutionally overbroad. We have repeatedly rejected the claim (see, e.g., *People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Ashmus* (1991) 54 Cal.3d 932, 980 [2 Cal.Rptr.2d 112, 820 P.2d 214]), concluding that local charging discretion does not render the death penalty law unconstitutionally vague or arbitrary. (*Brown, supra,* 33 Cal.4th at p. 403.)

### 19. *Absence of comparative review unconstitutional*

Defendant argues that comparative review is required under the Fifth, Sixth, Eighth, and Fourteenth Amendments so as "to prevent the 'wanton' and 'capricious' imposition of the death penalty." We have repeatedly rejected the argument (see, e.g., *Frye, supra,* 18 Cal.4th at p. 1029) and do so again here.

### 20. *Failure to narrow death-eligible class unconstitutional*

Defendant argues that California's 1978 death penalty statute unconstitutionally fails to meaningfully narrow the class of death-eligible defendants. We have repeatedly rejected this argument as well, finding that section 190.2 adequately narrows the class of murder for which the death penalty may be imposed. (*People v. Snow, supra,* 30 Cal.4th at p. 125; *Frye, supra,* 18 Cal.4th at p. 1029.)

### 21. *Failure of felony-murder special circumstance to narrow death-eligible class*

Defendant argues the felony-murder special circumstance under which he was rendered death eligible fails to meet minimal Eighth Amendment death penalty standards by failing to narrow the class of death-eligible defendants or define a subclass of those more deserving of the death penalty than others. He acknowledges that this court has repeatedly rejected the argument. (See, e.g., *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265–1266 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Marshall, supra,* 50 Cal.3d at pp. 945–946.) We do so again here.

### 22. *Noncapital sentencing error*

Defendant correctly argues he was erroneously sentenced under counts VI, VII, and IX (robberies of Adelaja, Cheatham and Dollison) to three one-year full consecutive terms for the deadly weapon enhancements, whereas, because he was consecutively sentenced on more than two robbery convictions involving the use of a deadly or dangerous weapon, and none of the robberies qualified as a violent felony under section 667.5, the subordinate term for each subsequent robbery conviction should have been limited to one-third the middle term of imprisonment and one-third of the enhancement, according to the then-applicable statute, former § 1170.95, subdivision (g). (Stats. 1988, ch. 811, § 1, p. 2617.) Accordingly, defendant asks this court to reduce his subordinate term by two years, from nine to seven years. Respondent concedes the sentencing error and agrees with the proposed reduction. We shall therefore order the abstract of judgment corrected to reflect the reduction of defendant's aggregate determinate sentence by two years.

## III. CONCLUSION

The abstract of judgment is ordered corrected to reflect the reduction of defendant's aggregate determinate sentence by two years. In all other respects the judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and King, J.,[*] concurred.

Appellants petition for a rehearing was denied October 18, 2006, and the opinion was modified to read as printed above. George, C. J., Baxter, J., and Corrigan, J., did not participate therein.

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.